# **EXHIBIT A**

## **CREDIT AGREEMENT**

EAST\188868734.6

**CREDIT AGREEMENT**

**dated as of June 28 , 2019**

**among**

**USA LENDCO HOLDINGS, LLC,**

**as Borrower,**

**THE VARIOUS FINANCIAL INSTITUTIONS PARTY HERETO,**
**as Lenders,**

**and**

**MIRAE ASSET SECURITIES & INVESTMENTS (USA), LLC,**
**as Administrative Agent**

# TABLE OF CONTENTS

**Page**

SECTION 1     DEFINITIONS ................................................................................ 1

    1.1     Definitions ...................................................................................... 1
    1.2     Other Interpretive Provisions ........................................................ 1

SECTION 2     COMMITMENTS OF THE LENDERS; BORROWING PROCEDURES. ......... 2

    2.1     Commitments .................................................................................. 2
    2.2     Borrowing Procedures ................................................................... 2
    2.3     Commitments Several ..................................................................... 3

SECTION 3     EVIDENCING OF LOANS ............................................................. 3

    3.1     Notes ................................................................................................ 3
    3.2     Recordkeeping ................................................................................ 3

SECTION 4     INTEREST ...................................................................................... 3

    4.1     Interest Rate .................................................................................... 3
    4.3     Computation of Interest ................................................................. 4

SECTION 5     FEES ............................................................................................... 4

    5.1     Arrange Fee ..................................................................................... 4

SECTION 6     PREPAYMENTS ............................................................................ 4

    6.1     Prepayments .................................................................................... 4

        6.1.1     Voluntary Prepayments ..................................................... 4
        6.1.2     Mandatory Prepayments ................................................... 4

    6.2     Manner of Prepayments ................................................................. 4
    6.3     Repayment of Loans ....................................................................... 5

SECTION 7     MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES ................. 5

    7.1     Making of Payments ....................................................................... 5
    7.2     Application of Certain Payments ................................................... 5
    7.3     Due Date Extension ........................................................................ 5
    7.4     Setoff ............................................................................................... 5
    7.5     Proration of Payments ................................................................... 5
    7.6     Taxes ............................................................................................... 6

SECTION 8     INCREASED COSTS ..................................................................... 8

    8.1     Increased Costs ............................................................................... 8
    8.2     Funding Losses ............................................................................... 8
    8.3     Discretion of Lenders as to Manner of Funding ........................ 9
    8.4     Conclusiveness of Statements; Survival of Provisions ............... 9

SECTION 9     REPRESENTATIONS AND WARRANTIES .............................. 9

    9.1     Organization ................................................................................... 10
    9.2     Authorization; No Conflict ........................................................... 10

-i-

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

| 9.3 | Validity and Binding Nature | 10 |
| 9.4 | Financial Condition | 10 |
| 9.5 | No Material Adverse Change | 10 |
| 9.6 | Litigation and Contingent Liabilities | 10 |
| 9.7 | Ownership of Properties; Liens | 11 |
| 9.8 | Equity Ownership; Subsidiaries | 11 |
| 9.9 | Pension Plans | 11 |
| 9.10 | Investment Company Act | 12 |
| 9.11 | Compliance with Laws | 12 |
| 9.12 | Regulation U | 12 |
| 9.13 | Taxes | 12 |
| 9.14 | Solvency, etc | 12 |
| 9.15 | Environmental Matters | 13 |
| 9.16 | Information | 14 |
| 9.17 | Burdensome Obligations | 14 |
| 9.18 | Anti-Terrorism Laws | 14 |
| 9.19 | No Default | 14 |
| 9.20 | Hedging Agreements | 15 |
| 9.21 | OFAC | 15 |
| 9.22 | Patriot Act | 15 |
| 9.23 | Related Agreements, etc | 15 |
| 9.24 | EEA Financial Institutions | 15 |

| SECTION 10 | AFFIRMATIVE COVENANTS | 15 |

| 10.1 | Reports, Certificates and Other Information | 15 |
| | 10.1.1 | Annual Report | 16 |
| | 10.1.2 | Interim Reports | 16 |
| | 10.1.3 | Reports to the SEC and to Shareholders | 16 |
| | 10.1.4 | Notice of Default, Litigation and ERISA Matters | 16 |
| | 10.1.5 | Projections | 17 |
| | 10.1.6 | Related Transaction Notices | 17 |
| | 10.1.7 | Prohibited Person | 18 |
| | 10.1.8 | Other Information | 18 |
| | 10.1.9 | Broker | 18 |

| 10.2 | Books, Records and Inspections | 18 |
| 10.3 | Compliance with Laws; Payment of Taxes and Liabilities | 18 |
| 10.4 | Maintenance of Existence, etc | 19 |
| 10.5 | Use of Proceeds | 19 |
| 10.6 | Employee Benefit Plans | 19 |
| 10.7 | Environmental Matters | 20 |
| 10.8 | Further Assurances | 20 |
| 10.9 | Margin Account | 20 |
| 10.10 | Post Closing Covenants | 21 |

# TABLE OF CONTENTS
(continued)

                                                                                        Page

SECTION 11  NEGATIVE COVENANTS ........................................................................ 21

    11.1    Debt.................................................................................................... 21
    11.2    Liens................................................................................................... 21
    11.3    Mergers, Consolidations, Sales........................................................ 22
    11.4    Modification of Organizational Documents ..................................... 22
    11.5    Transactions with Affiliates.............................................................. 22
    11.6    Inconsistent Agreements ................................................................... 22
    11.7    Business Activities; Issuance of Equity ........................................... 23
    11.8    Restriction of Amendments to Certain Documents .......................... 23
    11.9    Financial Covenants.......................................................................... 23
    11.10  Compliance with Laws ..................................................................... 23
    11.11  Prohibited Person ............................................................................. 23
    11.12  Ownership ......................................................................................... 23

SECTION 12  EFFECTIVENESS; CONDITIONS OF LENDING, ETC.................... 23

    12.1    Credit Extension................................................................................ 23

        12.1.1    Agreement, Notes and other Loan Documents .................. 23
        12.1.2    Authorization Documents ................................................... 23
        12.1.3    Consents, etc. ...................................................................... 24
        12.1.4    Letter of Direction.............................................................. 24
        12.1.5    Opinions of Counsel(s) ...................................................... 24
        12.1.6    Copies of Documents ......................................................... 24
        12.1.7    Payment of Fees ................................................................. 24
        12.1.8    Solvency Certificate ........................................................... 24
        12.1.9    Pro Forma Financial Statements and Projections ............. 24
        12.1.10  Search Results .................................................................... 25
        12.1.11  Filings, Registrations and Recordings .............................. 25
        12.1.12  Closing Certificate, Consents and Permits ....................... 25
        12.1.13  Financial Statements .......................................................... 25
        12.1.14  No Material Adverse Change.............................................. 25
        12.1.15  Know your client................................................................ 25
        12.1.16  Diligence ............................................................................ 25
        12.1.17  Financial Condition............................................................ 25
        12.1.18  Approvals............................................................................ 25
        12.1.19  Foreign Investors ............................................................... 25
        12.1.20  Consents ............................................................................. 26
        12.1.21  Other .................................................................................. 26

    12.2    Conditions ......................................................................................... 26

        12.2.1    Compliance with Warranties, No Default, etc. .................. 26
        12.2.2    Confirmatory Certificate .................................................... 26

SECTION 13  EVENTS OF DEFAULT AND THEIR EFFECT ............................... 27

    13.1    Events of Default .............................................................................. 27

SINGAPORE/#5424.7

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 13.1.1 | Non-Payment of the Loans, etc. | 27 |
| 13.1.2 | Non-Payment of Other Debt | 27 |
| 13.1.3 | Bankruptcy, Insolvency, etc. | 27 |
| 13.1.4 | Non-Compliance with Loan Documents | 27 |
| 13.1.5 | Representations; Warranties | 27 |
| 13.1.6 | Pension Plans | 28 |
| 13.1.7 | Judgments | 28 |
| 13.1.8 | Invalidity of Collateral Documents, etc. | 28 |
| 13.1.9 | Change of Control | 28 |
| 13.1.10 | Material Adverse Effect | 28 |
| 13.2 | Effect of Event of Default | 28 |
| 13.3 | Credit Bidding | 28 |
| SECTION 14 | THE ADMINISTRATIVE AGENT | 29 |
| 14.1 | Appointment and Authorization | 29 |
| 14.2 | Delegation of Duties | 29 |
| 14.3 | Exculpation of Administrative Agent | 30 |
| 14.4 | Reliance by Administrative Agent | 30 |
| 14.5 | Notice of Default | 30 |
| 14.6 | Credit Decision | 31 |
| 14.7 | Indemnification | 31 |
| 14.8 | Administrative Agent in Individual Capacity | 32 |
| 14.9 | Successor Administrative Agent | 32 |
| 14.10 | Collateral Matters | 32 |
| 14.11 | Restriction on Actions by Lenders | 33 |
| 14.12 | Administrative Agent May File Proofs of Claim | 33 |
| 14.13 | Other Agents; Arrangers and Managers | 34 |
| SECTION 15 | GENERAL | 34 |
| 15.1 | Waiver; Amendments | 34 |
| 15.2 | Confirmations | 35 |
| 15.3 | Notices | 35 |
| 15.4 | Computations | 35 |
| 15.5 | Costs, Expenses and Taxes | 36 |
| 15.6 | Assignments; Participations | 36 |
| 15.6.1 | Assignments | 36 |
| 15.6.2 | Participations | 37 |
| 15.7 | Register | 38 |
| 15.8 | GOVERNING LAW | 38 |
| 15.9 | Confidentiality | 38 |
| 15.10 | Severability | 39 |
| 15.11 | Nature of Remedies | 39 |
| 15.12 | Entire Agreement | 39 |

SINGAPORE/#5424.7

**TABLE OF CONTENTS**

(continued)

**Page**

15.13   Counterparts .......................................................................................... 39
15.14   Successors and Assigns .......................................................................... 39
15.15   Captions ................................................................................................. 40
15.16   Customer Identification – USA Patriot Act Notice ............................... 40
15.17   INDEMNIFICATION BY LOAN PARTIES ...................................... 40
15.18   Nonliability of Lenders ......................................................................... 41
15.19   FORUM SELECTION AND CONSENT TO JURISDICTION ......... 42
15.20   WAIVER OF JURY TRIAL ................................................................ 42

SECTION 16  ACKNOWLEDGMENT AND CONSENT TO BAIL-IN OF EEA
                FINANCIAL INSTITUTIONS ...................................................... 43

# TABLE OF CONTENTS
(continued)

### ANNEXES

| | |
|---|---|
| ANNEX A | Definitions |
| ANNEX B | Addresses for Notices |
| ANNEX C | Lenders and Pro Rata Shares |
| ANNEX D | Interest |

### EXHIBITS

| | |
|---|---|
| EXHIBIT A | Form of Note (Section 3.1) |
| EXHIBIT B | Form of Assignment Agreement (Section 15.6.1) |
| EXHIBIT C | Form of Notice of Borrowing (Section 2.2) |

SINGAPORE/#5424.7

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT dated as of June 28, 2019 (this "Agreement") is entered into among  (i) USA LendCo Holdings, LLC, a Delaware limited liability company ("Borrower"), (ii) the financial institutions that are or may from time to time become parties hereto (together with their respective successors and assigns, the "Lenders"), and (iii) Mirae Asset Securities & Investments (USA), LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Administrative Agent").

RECITALS

WHEREAS, Borrower has requested that the Lenders make Loans to provide the funds required to pay (i) the Arrange Fee pursuant to Section 5.1, (ii) the Prepaid Interest Amount pursuant to Section 4.2, (iii) the Pre-positioned Interest Amount pursuant to Section 4.2 into the Margin Account and (iv) the Deposit Amount into the Margin Account as well as to partially repay with the remaining proceeds of the Loans the Related Transaction, and the Lenders are willing to do so on the terms and conditions set forth herein.

WHEREAS, to secure the Loans and other Obligations, Borrower is granting to Administrative Agent, for the benefit of itself and the Lenders, a security interest in and lien upon the Margin Account pursuant to the Account Pledge Agreement.

WHEREAS, to secure the Loans and other Obligations, each Partner is granting to Administrative Agent, for the benefit of itself and the Lenders, a security interest in and lien upon the REIT Charged Shares pursuant to the REIT Share Charges.

WHEREAS, to secure the Loans and other Obligations, Borrower is granting to Administrative Agent, for the benefit of itself and the Lenders, a security interest in and charge upon the entire membership interest in respect of LendCo SPV pursuant to the Membership Interest Pledge Agreement.

WHEREAS, the Guarantors, on a joint and several basis, are guarantying all of the Loans and other Obligations pursuant to the Guaranty.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

SECTION 1    DEFINITIONS.

1.1    Definitions.  When used herein (including the recitals above), the terms set forth in Annex A shall have the meanings set forth therein.

1.2    Other Interpretive Provisions.  (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    Section, Annex and Exhibit references are to this Agreement unless otherwise specified.

(c)     The term "including" is not limiting and means "including without limitation."

(d)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

(e)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(f)     This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

(g)     This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Administrative Agent, Borrower, the Lenders and the other parties thereto and are the products of all parties.  Accordingly, they shall not be construed against Administrative Agent or the Lenders merely because of Administrative Agent's or the Lenders' involvement in their preparation.

(h)     For purposes of determining pro forma compliance with any financial covenant as of any date prior to the first date on which such financial covenant is to be tested hereunder, the level of any such financial covenant shall be deemed to be the covenant level for such first test date.

SECTION 2    COMMITMENTS OF THE LENDERS; BORROWING PROCEDURES.

2.1    <u>Commitments</u>.  On and subject to the terms and conditions of this Agreement, each of the Lenders, severally and for itself alone, agrees to make a loan to Borrower (each such loan, a "<u>Loan</u>" and, collectively, the "<u>Loans</u>") on the Closing Date in such Lender's Pro Rata Share of the aggregate amount of the Loan Commitments of all Lenders.  The Loans shall be utilized in a single utilization, and the Commitments of the Lenders to make the Loans shall expire concurrently with the making of the Loans on the Closing Date.  Amounts repaid or prepaid with respect to Loans may not be re-borrowed.

2.2    <u>Borrowing Procedures</u>.

2.2.1    Borrower shall give written notice (a "<u>Notice of Borrowing</u>") substantially in the form of <u>Exhibit C</u> or telephonic notice (followed immediately by a Notice of Borrowing) to Administrative Agent of the proposed borrowing not later than 10:00 a.m., Los Angeles time, on the proposed date of such borrowing.  Each notice

2

shall be effective upon receipt by Administrative Agent, shall be irrevocable, and shall specify the date and amount of borrowing. Promptly upon receipt of such notice, Administrative Agent shall advise each Lender thereof. Not later than 12:00 p.m., Los Angeles time, on the date of a proposed borrowing, each Lender shall provide Administrative Agent at the office specified by Administrative Agent with immediately available funds covering such Lender's Pro Rata Share of such borrowing and, so long as Administrative Agent has not received written notice that the conditions precedent set forth in <u>Section 12</u> with respect to such borrowing have not been satisfied, Administrative Agent shall pay over the funds received by Administrative Agent to Borrower on the requested borrowing date. The borrowing shall be on a Business Day.

2.2.2    Notwithstanding anything to the contrary, upon satisfaction of the requirements set forth in Section 2.2.1 above, the Lenders shall disburse an amount equal to the Loans less an amount equal to the Withheld Amount. The Withheld Amount shall be held by the Administrative Agent (on behalf of the Lenders) until the Borrower provides the Account Pledge Agreement in accordance with Section 10.10.1. Promptly following such provision, the Lenders shall deposit the Withheld Amount into the respective Margin Account and the Prepositioned Interest Account for application in accordance with the terms of this Agreement. For the avoidance of doubt, notwithstanding the Withheld Amount the entire Loans shall be deemed disbursed on the Closing Date and the arrangement contemplated by this Section 2.2 shall be without prejudice to the ongoing payment obligations of the Borrower as they become due and owing pursuant to this Agreement (including Section 4).

2.3    <u>Commitments Several</u>. The failure of any Lender to make a requested Loan on any date shall not relieve any other Lender of its obligation (if any) to make a Loan on such date, but no Lender shall be responsible for the failure of any other Lender to make any Loan to be made by such other Lender.

SECTION 3    EVIDENCING OF LOANS.

3.1    <u>Notes</u>. At a Lender's request, the Loan of such Lender shall be evidenced by a Note, with appropriate insertions, payable to the order of such Lender in a face principal amount equal to the principal amount of such Lender's Loan.

3.2    <u>Recordkeeping</u>. Administrative Agent, on behalf of each Lender, shall record in its records, the date and amount of each Loan made by each Lender and each repayment thereof. The aggregate unpaid principal amount so recorded shall be rebuttably presumptive evidence of the principal amount of the Loans owing and unpaid. The failure to so record any such amount or any error in so recording any such amount shall not, however, limit or otherwise affect the Obligations of Borrower hereunder or under any Note to repay the principal amount of the Loans hereunder, together with all interest accruing thereon, or any other Obligations.

SECTION 4    INTEREST.

4.1    <u>Interest Rate</u>. Borrower agrees to pay interest on the unpaid principal amount of the Loans for the period commencing on the date of the Loans until the Loans are paid in full at a

SINGAPORE/#5424.7

rate equal to the Interest Rate; _provided_ that at any time a Default or an Event of Default exists, the interest rate applicable to the Loans shall be equal to the sum of (i) the Interest Rate and (ii) 5.0%.   In no event shall interest payable by Borrower to any Lender hereunder exceed the maximum rate permitted under applicable law, and if any such provision of this Agreement is in contravention of any such law, such provision shall be deemed modified to limit such interest to the maximum rate permitted under such law.

4.2    _Interest Payments_.  Interest on the Loans shall be payable as follows:

4.2.1    In respect of the first 3 Interest Periods, in advance on the Closing Date, a non-refundable amount equal to 3-months of interest calculated at the Interest Rate (the "_Prepaid Interest Amount_").

4.2.2    Subject to section 7.3, in respect of the fourth and any subsequent Interest Periods until the Loan Maturity Date, in arrears on the 27th of each calendar month (save for the final Interest Period, which shall be payable on the 29th of June); provided, such interest payments shall be made from the Pre-positioned Interest Amount maintained in the Pre-positioned Interest Account.

4.2.3    After maturity, and at any time an Event of Default exists, accrued interest on all Loans shall be payable on demand.

4.2.4    Borrower shall use the proceeds of the Loans to, amongst other things, on the Closing Date, (a) pay the Lenders the Prepaid Interest Amount and (b) deposit an amount equal to the Pre-positioned Interest Amount into the Pre-positioned Interest Account to be applied in accordance with the provisions of Section 4.2.2.

4.3    _Computation of Interest_.  Interest shall be computed for the actual number of days elapsed on the basis of a year of 360 days.

4.4    _Interest Period._

4.4.1    The schedule of Interest Periods and Interest is set out in Annex D.

SECTION 5    FEES.

5.1    _Arrange Fee_.  On the Closing Date, Borrower agrees to pay to Administrative Agent for the account of each Lender the Arrange Fee. Borrower shall use the proceeds of the Loans to, amongst other things, to pay the Arrange Fee on the Closing Date.

SECTION 6    PREPAYMENTS.

6.1    _Prepayments_.

6.1.1    _Voluntary Prepayments_.  Borrower may from time to time prepay the Loans, in whole or in part, at any time; _provided_ that Borrower shall give Administrative Agent (which shall promptly advise each Lender) notice thereof not later than 10:00 a.m., Los Angeles time, on the day of such prepayment of the Loans (which shall be a Business

Day), specifying the date and amount of prepayment.  Any such partial prepayment of the Loan shall be in an amount equal to $500,000 or a higher integral multiple of $100,000 (or, if less, the balance of the Loans).

6.1.2    <u>Mandatory Prepayments</u>.  Borrower shall prepay the Loans, in whole or in part, within three (3) Business Days of the occurrence thereof, (i) upon receipt of any proceeds from the disposition or liquidation of any Facilities, an amount equal to such proceeds net of (a) the direct costs relating to such disposition or liquidation and (b) taxes paid or reasonably estimated by Borrower to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); (ii) upon the occurrence of any Accordion Facility Increase, an amount equal to the actual increase in the commitment amount thereunder; (iii) upon the repayment or prepayment of the LendCo SPV Loan including, for the avoidance of doubt, pursuant to section 3 of the LendCo SPV Note, an amount equal to such repayment or prepayment (each a "<u>Mandatory Prepayment Event</u>").

6.2    <u>Manner of Prepayments</u>.  Save as provided in <u>Section 4.2</u>, all prepayments of Loans shall be applied *pro rata* among the Loans according to the principal amounts thereof and, as to each Loan, in the inverse order of maturity to the remaining installments thereof (including, without limitation, the final installment thereof), and shall include any accrued and unpaid interest due.

6.3    <u>Repayment of Loans</u>. Unless sooner paid in full, the outstanding principal balance of the Loans shall be paid in full on the Loan Maturity Date.

SECTION 7    MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES.

7.1    <u>Making of Payments</u>.  All payments of principal or interest on the Note(s), and of all fees and other amounts, shall be made by Borrower to Administrative Agent in immediately available funds at the office specified by Administrative Agent not later than 12:00 p.m., Los Angeles time, on the date due; and funds received after that hour shall be deemed to have been received by Administrative Agent on the following Business Day.  Administrative Agent shall promptly remit to each Lender its share of all such payments received in collected funds by Administrative Agent for the account of such Lender.  All payments under <u>Section 8.1</u> shall be made by Borrower directly to the Lender entitled thereto without setoff, counterclaim or other defense.

7.2    <u>Application of Certain Payments</u>.  So long as no Default or Event of Default has occurred and is continuing, (a) payments matching specific scheduled payments then due shall be applied to those scheduled payments and (b) voluntary and mandatory prepayments shall be applied as set forth in <u>Sections 6.1</u> and <u>6.2</u>.  After the occurrence and during the continuance of a Default or an Event of Default, all amounts collected or received by Administrative Agent or any Lender as proceeds from the sale of, or other realization upon, all or any part of the Collateral shall be applied as Administrative Agent shall determine in its sole and absolute discretion.

7.3    <u>Due Date Extension</u>.  If any payment of principal or interest with respect to any of the Loans, or of any fees or other amounts, falls due on a day which is not a Business Day, then

SINGAPORE/#5424.7

such due date shall be extended to the immediately following Business Day and additional interest shall accrue and be payable for the period of any such extension.

7.4     Setoff.  Borrower, for itself and each other Loan Party, agrees that Administrative Agent and each Lender have all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, Borrower, for itself and each other Loan Party, agrees that at any time any Event of Default exists, Administrative Agent and (subject to Section 14.12) each Lender may apply to the payment of any Obligations of Borrower and each other Loan Party hereunder, whether or not then due, any and all balances, credits, deposits, accounts or moneys of Borrower and each other Loan Party then or thereafter with Administrative Agent or such Lender.

7.5     Proration of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of offset or otherwise), on account of (a) principal of or interest on any Loan (but excluding any payment pursuant to Section 8 or 15.6), then such Lender shall purchase from the other Lenders such participations in the Loans held by them as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery.

7.6     Taxes.

(a)     All payments made by Borrower hereunder or under any Loan Documents shall be made without setoff, counterclaim, or other defense.  To the extent permitted by applicable law, all payments hereunder or under the Loan Documents (including any payment of principal, interest, or fees) to, or for the benefit, of any Person shall be made by Borrower free and clear of and without deduction or withholding for, or account of, any Taxes or Excluded Taxes now or hereinafter imposed by any taxing authority.

(b)     If Borrower makes any payment hereunder or under any Loan Document in respect of which it is required by applicable law to deduct or withhold any Taxes, Borrower shall increase the payment hereunder or under any such Loan Document such that after the reduction for the amount of Taxes withheld (and any taxes withheld or imposed with respect to the additional payments required under this Section 7.6(b)), the amount paid to the Lenders or Administrative Agent equals the amount that was payable hereunder or under any such Loan Document without regard to this Section 7.6(b).  To the extent Borrower withholds any Taxes or any Excluded Taxes on payments hereunder or under any Loan Document, Borrower shall pay the full amount deducted to the relevant taxing authority within the time allowed for payment under applicable law and shall deliver to Administrative Agent within 30 days after it has made payment to such authority a receipt issued by such authority (or other evidence satisfactory to Administrative Agent) evidencing the payment of all amounts so required to be deducted or withheld from such payment. Borrower shall timely pay to the relevant taxing authority in accordance with applicable law, or at the option of Administrative Agent timely reimburse it for the payment of, any Other Taxes.

SINGAPORE/#5424.7

(c)     If any Lender or Administrative Agent is required by law to make any payments of any Taxes (including any Other Taxes) on or in relation to any amounts received or receivable hereunder or under any other Loan Document, or any Tax (including any Other Tax) is assessed against a Lender or Administrative Agent with respect to amounts received or receivable hereunder or under any other Loan Document, Borrower will indemnify such person against (i) such Tax (and any reasonable counsel fees and expenses associated with such Tax) and (ii) any taxes imposed as a result of the receipt of the payment under this Section 7.6(c).  A certificate prepared in good faith as to the amount of such payment by such Lender or Administrative Agent shall, absent manifest error, be final, conclusive, and binding on all parties.

(d)     (i) To the extent permitted by applicable law, each Lender that is not a United States person within the meaning of Code Section 7701(a)(30) (a "Non-U.S. Participant") shall deliver to Borrower and Administrative Agent on or prior to the Closing Date (or in the case of a Lender that is an Assignee, on the date of such assignment to such Lender) two accurate and complete original signed copies of IRS Form W-8BEN, W-8ECI, or W-8IMY (or any successor or other applicable form prescribed by the IRS) certifying to such Lender's entitlement to a complete exemption from, or a reduced rate in, United States withholding tax on interest payments to be made hereunder or any Loan.  If a Lender that is a Non-U.S. Participant is claiming a complete exemption from withholding on interest pursuant to Code Sections 871(h) or 881(c), the Lender shall deliver (along with two accurate and complete original signed copies of IRS Form W-8BEN) a certificate in form and substance reasonably acceptable to Administrative Agent (any such certificate, a "Withholding Certificate").  In addition, each Lender that is a Non-U.S. Participant agrees that from time to time after the Closing Date (or in the case of a Lender that is an Assignee, after the date of the assignment to such Lender), when a lapse in time (or change in circumstances occurs) renders the prior certificates hereunder obsolete or inaccurate in any material respect, such Lender shall, to the extent permitted under applicable law, deliver to Borrower and Administrative Agent two new and accurate and complete original signed copies of an IRS Form W-8BEN, W-8ECI, or W-8IMY (or any successor or other applicable forms prescribed by the IRS), and if applicable, a new Withholding Certificate, to confirm or establish the entitlement of such Lender or Administrative Agent to an exemption from, or reduction in, United States withholding tax on interest payments to be made hereunder or any Loan.

(ii)     Each Lender that is not a Non-U.S. Participant (other than any such Lender which is taxed as a corporation for U.S. federal income tax purposes) shall provide two properly completed and duly executed copies of IRS Form W-9 (or any successor or other applicable form) to Borrower and Administrative Agent certifying that such Lender is exempt from United States backup withholding tax. To the extent that a form provided pursuant to this Section 7.6(d)(ii) is rendered obsolete or inaccurate in any material respect as result of change in circumstances with respect to the status of a Lender, such Lender shall, to the extent permitted by applicable law, deliver to Borrower and Administrative Agent revised forms necessary to confirm or establish the entitlement to such Lender's or Administrative Agent's exemption from United States backup withholding tax.

(iii)     Borrower shall not be required to pay additional amounts to a Lender, or indemnify any Lender, under this Section 7.6 to the extent that such obligations would not have arisen but for the failure of such Lender to comply with Section 7.6(d).

(iv)     Each Lender agrees to indemnify Administrative Agent and hold Administrative Agent harmless for the full amount of any and all present or future Taxes (including any Other Taxes) and related liabilities (including penalties, interest, additions to tax and expenses, and any Taxes imposed by any jurisdiction on amounts payable to Administrative Agent under this Section 7.6) which are imposed on or with respect to principal, interest or fees payable to such Lender hereunder and which are not paid by Borrower pursuant to this Section 7.6, whether or not such Taxes or related liabilities were correctly or legally asserted.  This indemnification shall be made within 30 days from the date Administrative Agent makes written demand therefor.

(e)     Each Loan Party's obligations under this Section 7.6 shall survive the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations.

SECTION 8    INCREASED COSTS.

8.1    Increased Costs.

(a)     If, after the date hereof, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:  (i) shall impose, modify or deem applicable any reserve (including any reserve imposed by the FRB), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by any Lender; or (ii) subject any Lender to any taxes or similar fees on its loans, loan principal, letters of credit, commitments or other obligation or its deposits, reserves, other liabilities or capital attributable thereto or change the basis of taxation of any payments to the Lender in respect thereof (except for Taxes to the extent the indemnification and responsibility of which are covered by Section 7.6 hereof); and the result of anything described in clauses (i) and (ii) above is to reduce the amount of any sum received or receivable by such Lender under this Agreement or under its Note with respect thereto, then upon demand by such Lender, Borrower shall pay directly to such Lender such additional amount as will compensate such Lender for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is 180 days prior to the date on which such Lender first made demand therefor.

(b)     If any Lender shall reasonably determine that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any

SINGAPORE/#5424.7

change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or the compliance by any Lender or any Person controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by such Lender or such controlling Person to be material, then from time to time, upon demand by such Lender, Borrower shall pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction so long as such amounts have accrued on or after the day which is 180 days prior to the date on which such Lender first made demand therefor.

8.2   <u>Funding Losses</u>.   Borrower hereby agrees that, upon demand by any Lender, Borrower will indemnify such Lender against any net out-of-pocket loss or expense which such Lender may sustain or incur (including any such net loss or expense incurred by reason of the liquidation or reemployment of deposits), as reasonably determined by such Lender, as a result of (a) any payment or prepayment of any Loan of such Lender on a date other than the due date for any such payment or prepayment or (b) any failure of Borrower to borrow, prepay or continue any Loan on a date specified therefor in a notice of borrowing, prepayment or continuation pursuant to this Agreement.   For this purpose, all notices to Administrative Agent pursuant to this Agreement shall be deemed to be irrevocable.

8.3   <u>Discretion of Lenders as to Manner of Funding</u>.   Notwithstanding any provision of this Agreement to the contrary, each Lender shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit.

8.4   <u>Conclusiveness of Statements; Survival of Provisions</u>.   Determinations and statements of any Lender pursuant to <u>Sections 8.1</u> or <u>8.2</u> shall be conclusive absent manifest error. The provisions of such Sections shall survive repayment of the Obligations, cancellation of any Note(s) and termination of this Agreement.   For purposes of this Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be adopted and gone into effect after the date of this Agreement.

8.5   <u>Subordinated Intercompany Funding</u>.   Borrower has entered into agreements or arrangements with each Borrower Parent (or its Affiliates) pursuant to which such Borrower Parent (or its Affiliates) either has subscribed for shares in the Borrower or has made equity contributions to the Borrower or has provided an intercompany loan to the Borrower in a collective amount of $89,000,000. Each of Borrower and other Loan Parties agrees for the benefit of Administrative Agent and the Lenders that (i) any claims that each Borrower Parent (or its Affiliates) may have

9

against the Borrower as a consequence of any Intercompany Funding being made to Borrower are expressly subject and subordinate to the claims of Administrative Agent and the Lenders against Borrower under the Loan Documents, (ii) each Borrower Parent's (or its Affiliates) rights to receive any payments from the Borrower in respect of the Intercompany Funding shall be subject and subordinate in right of payment to the prior and indefeasible payment and performance in full of the Obligations under this Agreement and any other Loan Document, (iii) each Borrower Parent (or its Affiliates) shall not be entitled to demand payment or commence proceedings in relation to the Intercompany Funding or take any step or action with a view to the commencement of any insolvency proceedings with respect to Borrower and (iv) any claims of each Borrower Parent (or its Affiliates) will rank behind the claims of Administrative Agent and the Lenders against Borrower in the event Borrower becomes subject to any insolvency proceedings.

SECTION 9    REPRESENTATIONS AND WARRANTIES.

To induce Administrative Agent and the Lenders to enter into this Agreement and to induce the Lenders to make Loans hereunder, Borrower represents and warrants to Administrative Agent and the Lenders that:

9.1    <u>Organization</u>.  Each Loan Party (other than the Partners) is validly existing and in good standing under the laws of its jurisdiction of organization; and each Loan Party is duly qualified to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required, except for such jurisdictions where the failure to so qualify would not have a Material Adverse Effect.

9.2    <u>Authorization; No Conflict</u>.  Each Loan Party is duly authorized to execute and deliver each Loan Document to which it is a party, Borrower is duly authorized to borrow monies hereunder and each Loan Party is duly authorized to perform its Obligations under each Loan Document to which it is a party.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, and the borrowings by Borrower hereunder, do not and will not (a) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict with (i) any provision of law, (ii) the charter, by-laws or other organizational documents of any Loan Party or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon any Loan Party or any of their respective properties or (c) require, or result in, the creation or imposition of any Lien on any asset of any Loan Party (other than Liens in favor of Administrative Agent created pursuant to the Collateral Documents).

9.3    <u>Validity and Binding Nature</u>.  Each of this Agreement and each other Loan Document to which any Loan Party is a party is the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

9.4    <u>Financial Condition</u>.  The reviewed consolidated financial statements of Borrower and its Subsidiaries as at December 31, 2018, and the unaudited consolidated financial statements of Borrower and its Subsidiaries as at March 31, 2019, copies of each of which have been delivered to each Lender, were prepared in accordance with GAAP (subject, in the case of such unaudited

statements, to the absence of footnotes and to normal year-end adjustments) and present fairly the consolidated financial condition of Borrower and its Subsidiaries as at such dates and the results of their operations for the periods then ended.

9.5     No Material Adverse Change.  Since June 14, 2019, there has been no material adverse change in the financial condition, operations, assets, business, properties or prospects of the Loan Parties taken as a whole.

9.6     Litigation and Contingent Liabilities.  As of the Closing Date, no action, suit, litigation (including derivative actions), judgment, arbitration proceeding, governmental investigation or proceeding or other proceeding is pending or, to Borrower's knowledge, threatened against any Loan Party.  Except as otherwise disclosed to the Lenders, no Loan Party has any material contingent liabilities. No action, suit, litigation (including derivative actions), judgment, arbitration proceeding, governmental investigation or proceeding or other proceeding is pending or, to Borrower's knowledge, threatened against any Loan Party which could reasonably be expected to have a Material Adverse Effect.

9.7     Ownership of Properties; Liens.  Each Loan Party owns good and, in the case of real property,  marketable title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and the like) except as permitted by Section 11.2.  No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Permitted Liens and filings for which termination statements have been delivered to Administrative Agent.

9.8     Equity Ownership; Subsidiaries.  All issued and outstanding Capital Securities of each Loan Party are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than those in favor of Administrative Agent, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  As of the Closing Date, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Capital Securities of any Loan Party.

9.9     Pension Plans.  (a) The Unfunded Liability of all Pension Plans does not in the aggregate exceed twenty percent of the Total Plan Liability for all such Pension Plans.  Each Pension Plan complies in all material respects with all applicable requirements of law and regulations.  No contribution failure under Section 430 of the Code, Section 303 of ERISA or the terms of any Pension Plan has occurred with respect to any Pension Plan, sufficient to give rise to a Lien under Section 303(k) of ERISA, or otherwise to have a Material Adverse Effect.  There are no pending or, to the knowledge of Borrowers, threatened, claims, actions, investigations or lawsuits against any Pension Plan, any fiduciary of any Pension Plan, or any Loan Party or any other member of the Controlled Group with respect to a Pension Plan or a Multiemployer Pension Plan which could reasonably be expected to have a Material Adverse Effect.  No Loan Party and no other member of the Controlled Group has engaged in any prohibited transaction (as defined in Section 4975 of the Code or Section 406 of ERISA) in connection with any Pension Plan or Multiemployer Pension Plan which would subject that Person to any material liability.  Within the

11

past five years, no Loan Party and no other member of the Controlled Group has engaged in a transaction which resulted in a Pension Plan with an Unfunded Liability being transferred out of the Controlled Group, which could reasonably be expected to have a Material Adverse Effect.  No Termination Event has occurred or is reasonably expected to occur with respect to any Pension Plan, which could reasonably be expected to have a Material Adverse Effect.

(b)    All contributions (if any) have been made to any Multiemployer Pension Plan that are required to be made by Loan Parties or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable law; no Loan Party and no other member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Pension Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan; and no Loan Party and no other member of the Controlled Group has received any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

9.10    <u>Investment Company Act</u>.  No Loan Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," within the meaning of the Investment Company Act of 1940.

9.11    <u>Compliance with Laws</u>.  Each Loan Party and each Subsidiary thereof is in compliance with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

9.12    <u>Regulation U</u>.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

9.13    <u>Taxes</u>. Each Loan Party has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such return, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.  The Loan Parties have made adequate reserves on their books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.  No Loan Party has participated in any transaction that relates to a year of the taxpayer (which is still open under the applicable statute of limitations) which is a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2) (irrespective of the date when the transaction was entered into).  No Loan Party is a party to any Tax sharing, Tax indemnity or similar agreement or arrangement with any other Person.

9.14    <u>Solvency, etc</u>.  On the Closing Date and the borrowing of the Loans hereunder and the use of the proceeds thereof, with respect to each Loan Party, individually, (a) the fair value of its assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated in accordance with GAAP, (b) the present fair saleable value of its assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (c) it is able to realize upon its assets and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (d) it does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature and (e) it is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

9.15    <u>Environmental Matters</u>.

(a)    Each of the Facilities and all past and current operations at or from the Facilities are in compliance with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Facilities or the Loan Party's operations, and there are no conditions relating to the Facilities or the Loan Party's operations that could give rise to liability or obligation under any applicable Environmental Laws.

(b)    None of the Facilities contains or has previously contained any Hazardous Substances at, on or under the Facilities in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

(c)    Each Loan Party has obtained, and maintained in good standing, all licenses, permits, authorizations, registrations and other approvals required under any Environmental Law and required for their respective ordinary course operations, and for their reasonably anticipated future operations, and each Loan Party is in compliance with all terms and conditions thereof.

(d)    No Loan Party has received or reasonably anticipates the issuance of any written or verbal notice of, or inquiry from, or agreement with, any federal, state or local Governmental Authority regarding any violation, alleged violation, non-compliance, liability or potential liability arising under Environmental Laws with regard to any of the Facilities or the Loan Party's operations, nor does any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

(e)    Hazardous Substances have not been transported or disposed of from the Facilities, or generated, treated, stored or disposed of at, on or under any of the Facilities or any other location, in each case by or on behalf of any Loan Party, or arising from any Loan Party's operations, in violation of, or in a manner that would be reasonably likely to give rise to liability under, any applicable Environmental Law.

(f)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Loan Parties, threatened, under any Environmental Law to

SINGAPORE/#5424.7

which any Loan Party is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Loan Party, the Facilities or the Loan Party's operations.

(g)    There has been no release of Hazardous Substances at or from the Facilities, or arising from or related to the operations (including disposal) of any Loan Party in connection with the Facilities or otherwise in connection with the Loan Party's operations, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

(h)    No Loan Party has any underground storage tanks that are not properly registered or permitted under applicable Environmental Laws or that at any time have released, leaked, disposed of or otherwise discharged Hazardous Substances.

9.16    <u>Information</u>.  All information heretofore or contemporaneously herewith furnished in writing by any Loan Party to Administrative Agent or any Lender for purposes of or in connection with this Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of any Loan Party to Administrative Agent or any Lender pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Administrative Agent and the Lenders that any projections and forecasts provided by Borrower are based on good faith estimates and assumptions believed by Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

9.17    <u>Burdensome Obligations</u>.  No Loan Party is a party to any agreement or contract or subject to any restriction contained in its organizational documents which could reasonably be expected to have a Material Adverse Effect.

9.18    <u>Anti-Terrorism Laws</u>.

(a)    No Loan Party (and, to the knowledge of each Loan Party, no joint venture or subsidiary thereof) is in violation of any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "<u>Anti-Terrorism Laws</u>"), including the United States Executive Order No. 13224 on Terrorist Financing (the "<u>Anti-Terrorism Order</u>") and the Patriot Act.

(b)    No Loan Party nor any of their respective affiliated entities (i) is or will be listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is or will be owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order, (iv) is or will be named as a "specially designated national and

blocked person" in the most current list published by OFAC or (v) is or will be affiliated with any entity or person listed above.

(c)     No Loan Party nor any of their respective affiliated entities (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in clauses (b)(i) through (b)(v) above (each a "Prohibited Person"), (ii) deals in, or otherwise engages in any transactions relating to, any property or interests in property blocked pursuant to the Anti-Terrorism Order or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

9.19    No Default.  No Default or Event of Default exists or would result from the incurrence by any Loan Party of any Debt hereunder or under any other Loan Document.  No Loan Party is in breach of or default under any contractual obligation that could reasonably be expected to have a Material Adverse Effect.

9.20    Hedging Agreements.  No Loan Party is a party to, nor will it be a party to, any Hedging Agreement other than a bona fide (not speculative) Hedging Agreement, in form and substance reasonably acceptable to Administrative Agent, to protect the Loan Parties against fluctuations in interest rates.

9.21    OFAC.  Each Loan Party is and will remain in compliance with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  No Loan Party and no Affiliate of a Loan Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

9.22    Patriot Act.  The Loan Parties and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

15

9.23    Related Agreements, etc.  Borrower has heretofore furnished Administrative Agent a true and correct copy of the Related Agreements.

9.24    EEA Financial Institutions.  No Loan Party or Subsidiary thereof is an EEA Financial Institution.

SECTION 10  AFFIRMATIVE COVENANTS.

Until the expiration or termination of the Commitments and thereafter until all Obligations hereunder and under the other Loan Documents are paid in full, Borrower agrees that, unless at any time the Required Lenders shall otherwise expressly consent in writing, it will:

10.1    Reports, Certificates and Other Information.  Furnish to Administrative Agent and each Lender:

10.1.1    Annual Report.  Promptly when available and in any event within 90 days after the close of each Fiscal Year: a copy of the annual audit report of Borrower and its Subsidiaries for such Fiscal Year, including therein consolidated balance sheets and statements of income or operations, retained earnings, shareholders' equity and cash flows of Borrower and its Subsidiaries as at the end of such Fiscal Year, certified without adverse reference to going concern value and without qualification by independent auditors of recognized standing selected by Loan Parties and reasonably acceptable to Administrative Agent, together with (i) a written statement from such accountants to the effect that in making the examination necessary for the signing of such annual audit report by such accountants, nothing came to their attention that caused them to believe that Loan Parties were not in compliance with any provision of Sections 11.1, 11.3, 11.4 or 11.14 of this Agreement insofar as such provision relates to accounting matters or, if something has come to their attention that caused them to believe that Loan Parties were not in compliance with any such provision, describing such non-compliance in reasonable detail and (ii) a comparison with the budget for such Fiscal Year and a comparison with the previous Fiscal Year, certified by a Senior Officer of Borrower.

10.1.2    Interim Reports.  Promptly when available and in any event within 30 days after the end of each month, consolidated and consolidating balance sheets of Borrower and its Subsidiaries as of the end of such month, together with consolidated and consolidating statements of income or operations, retained earnings, shareholders' equity and cash flows for such month and for the period beginning with the first day of such Fiscal Year and ending on the last day of such month, together with a comparison with the corresponding period of the previous Fiscal Year and a comparison with the budget for such period of the current Fiscal Year, certified by a Senior Officer of Borrower.

10.1.3    Reports to the SEC and to Shareholders.  Promptly upon the filing or sending thereof, copies of all regular, periodic or special reports of any Loan Party filed with the SEC; copies of all registration statements of any Loan Party filed with the SEC (other than on Form S-8); and copies of all proxy statements or other communications made to security holders generally.

16

10.1.4    <u>Notice of Default, Litigation and ERISA Matters</u>.    Promptly upon becoming aware of any of the following, written notice describing the same and the steps being taken by Loan Parties or any Subsidiary affected thereby with respect thereto:

(a)    the occurrence of a Default or an Event of Default;

(b)    any litigation, arbitration or governmental investigation or proceeding not previously disclosed by Borrower to Administrative Agent which has been instituted or, to the knowledge of Borrower, is threatened against any Loan Party or to which any of the properties of any Loan Party is subject which could reasonably be expected to have a Material Adverse Effect;

(c)    the institution of any steps by any member of the Controlled Group or any other Person to terminate any Pension Plan, or the failure of any member of the Controlled Group to make a required contribution to any Pension Plan (if such failure is sufficient to give rise to a Lien under Section 303(k) of ERISA) or to any Multiemployer Pension Plan, or the taking of any action with respect to a Pension Plan which could result in the requirement that any Loan Party furnish a bond or other security to the PBGC or such Pension Plan, or the occurrence of any event with respect to any Pension Plan or Multiemployer Pension Plan which could result in the incurrence by any member of the Controlled Group of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Pension Plan), or any material increase in the contingent liability of any Loan Party with respect to any post-retirement welfare benefit plan or other employee benefit plan of any Loan Party or another member of the Controlled Group, or any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent; or

(d)    any other event (including (i) any violation of any Environmental Law or the assertion of any Environmental Claim or (ii) the enactment or effectiveness of any law, rule or regulation) which could reasonably be expected to have a Material Adverse Effect.

10.1.5    <u>Projections</u>.    As soon as practicable, and in any event not later than 5 days of provision pursuant to section 6.02(r) of the BAML Accordion Facility, the annual or capital budgets delivered in accordance with section 6.02(r) of the BAML Accordion Facility.

10.1.6    <u>Related Transaction Notices</u>.    Promptly following receipt or delivery, copies of any notices (including notices of default or acceleration) received from or delivered to any holder, trustee, seller (or any representative of any of the foregoing) of, under or in connection with the Related Transaction.

10.1.7    <u>Prohibited Person</u>.    Immediately, from time to time, deliver to Administrative Agent or Lenders any such certification or other evidence as may be reasonably requested by such Administrative Agent or Lender in its sole and absolute

discretion, confirming that (i) none of the Loan Parties is a Prohibited Person and (ii) none of the Loan Parties has engaged in any business transaction or dealings with a Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods or services to or for the benefit of a Prohibited Person.

10.1.8    <u>Other Information</u>.  Promptly from time to time, such other information (including, without limitation, business or financial data, reports, appraisals and projections) concerning the Loan Parties, their properties or business, as Administrative Agent may reasonably request, including, without limitation, providing Administrative Agent or Lenders with any information and documentation reasonably requested for purposes of compliance with the Beneficial Ownership Regulation or other applicable anti-money laundering laws under 31 U.S.C. 5318(h) and its implementing regulations.

10.1.9    <u>Broker</u>.    Contemporaneously with their engagement, disclose to Administrative Agent the identity of all brokers engaged by or on behalf of Borrower or any other Loan Party or any of their Affiliates in connection with the Loans. All costs, finder's fees, commissions, concessions, remuneration or similar fee or compensation related or in connection with such engagement shall be the sole and absolute responsibility of Borrower.

10.2    <u>Books, Records and Inspections</u>.  Keep, and cause each other Loan Party to keep, its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP; keep, and cause each other Loan Party to keep, its books and records in an electronic medium and to allow Administrative Agent remote access thereto at all times; permit, and cause each other Loan Party to permit, Administrative Agent or any representative or agent thereof to inspect the properties and operations of the Loan Parties; and permit, and cause each other Loan Party to permit, at any reasonable time and with reasonable notice (or at any time without notice if an Event of Default exists), Administrative Agent or any representative or agent thereof to visit any or all of its offices, to discuss its financial matters with its officers and its independent auditors (and Borrower hereby authorizes such independent auditors to discuss such financial matters with Administrative Agent or any representative or agent thereof), and to examine (and, at the expense of the Loan Parties, photocopy extracts from) any of its books or other records; and permit, and cause each other Loan Party to permit, Administrative Agent and its representatives and agents to inspect the inventory and other tangible assets of the Loan Parties, to perform appraisals of the equipment of the Loan Parties, and to inspect, audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to inventory, accounts and any other collateral.  All such inspections or audits by Administrative Agent shall be at Borrower's expense.

10.3    <u>Compliance with Laws; Payment of Taxes and Liabilities</u>.  (a)  Comply, and cause each other Loan Party to comply, with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect; (b) without limiting <u>clause (a)</u> above, ensure, and cause each other Loan Party to ensure, that no person who owns a controlling interest in or otherwise controls a Loan Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"), Department of the Treasury,

and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, (c) without limiting clause (a) above, comply, and cause each other Loan Party to comply, with all applicable Bank Secrecy Act ("BSA") and anti-money laundering laws and regulations and (d) pay, and cause each other Loan Party to pay, prior to delinquency, all taxes and other governmental charges against it or any of its property, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require any Loan Party to pay any such tax or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a claim which could become a Lien on any collateral, such contest proceedings shall stay the foreclosure of such Lien or the sale of any portion of the collateral to satisfy such claim.

10.4    Maintenance of Existence, etc. Maintain and preserve, and (subject to Section 11.5) cause each other Loan Party to maintain and preserve, (a) (other than the Partners) its existence and good standing in the jurisdiction of its organization and (b) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be qualified or in good standing could not reasonably be expected to have a Material Adverse Effect).

10.5    Use of Proceeds. Use the proceeds of the Loans solely to pay (i) the Arrange Fee pursuant to Section 5.1, (ii) the Prepaid Interest Amount pursuant to Section 4.2, (iii) the Pre-positioned Interest Amount pursuant to Section 4.2 into the Pre-positioned Interest Account and (iv) the Deposit Amount into the Margin Account as well as to partially repay with the remaining proceeds of the Loans the Related Transaction.

10.6    Employee Benefit Plans.

(a)    Maintain, and cause each other member of the Controlled Group to maintain, each Pension Plan in substantial compliance with all applicable requirements of law and regulations.

(b)    Make, and cause each other member of the Controlled Group to make, on a timely basis, all required contributions to any Multiemployer Pension Plan.

(c)    Not, and not permit any other member of the Controlled Group to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Pension Plan or (iii) take any other action with respect to any Pension Plan that would reasonably be expected to entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) individually or in the aggregate would not have a Material Adverse Effect.

10.7    Environmental Matters. (a) If any release or threatened release or other disposal of Hazardous Substances shall occur or shall have occurred on any of the Facilities or any other assets of any Loan Party, Borrower shall, or shall cause the applicable Loan Party to, cause the prompt

19

containment and removal of such Hazardous Substances and the remediation of such real property or other assets as necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets.  Without limiting the generality of the foregoing, Borrower shall, and shall cause each other Loan Party to, comply with any Federal or state judicial or administrative order requiring the performance at any of the Facilities of any Loan Party of activities in response to the release or threatened release of a Hazardous Substance.  To the extent that the transportation, handling, storage, generation, treatment or disposal of Hazardous Substances is permitted by this Agreement, Borrower shall, and shall cause each other Loan Party to comply with Environmental Laws in all such activities and to dispose of such Hazardous Substances, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

(b)    Borrower shall comply in all material respects with the requirements of all federal, state, and local Environmental Laws applicable to the Loan Parties or the Facilities; notify Administrative Agent promptly in the event of any spill, release or disposal of Hazardous Substances on, or hazardous waste pollution or contamination affecting, the Facilities in material violation of applicable Environmental Laws of which a Loan Party has actual knowledge; forward to Administrative Agent promptly any written notices relating to such matters received from any Governmental Authority; and pay when due any fine or assessment against the Facilities arising under Environmental Laws, provided, that the Loan Parties shall not be required to pay any such fine or assessment so long as the validity thereof shall be diligently contested in good faith by appropriate proceedings and they shall have set aside on their books reasonable reserves (in accordance with GAAP) with respect to any such fine or assessment so contested; and provided further that, in any event, payment of any such fine or assessment shall be made before any of the Facilities shall be subjected to a Lien or be seized or sold in satisfaction thereof.

(c)    Borrower shall promptly notify Administrative Agent upon becoming aware of any fact or change in circumstances that would be expected to cause any of the representations and warranties contained in Section 9.15 to cease to be true in all material respects for any time before the Closing Date.

10.8    Further Assurances.  Take, and cause each other Loan Party to take, such actions as are necessary or as Administrative Agent or the Lenders may reasonably request from time to time to establish, maintain protect and/or perfect the rights and interests of Administrative Agent and Lenders in and to the Collateral or otherwise to give effect to the purposes and intent of the Loan Documents and the transactions thereby contemplated thereunder.

10.9    Accounts.  Unless Administrative Agent otherwise consents in writing, in order to facilitate Administrative Agent's and the Lenders' maintenance and monitoring of their security interests in the Collateral, maintain the Margin Account and the Pre-positioned Interest Account. On the Closing Date, Borrower shall deposit (i) the Deposit Amount into the Margin Account, and (ii) the Pre-positioned Interest Amount into the Pre-positioned Interest Account from the proceeds of the Loans.

10.10   <u>Post Closing Covenants</u>.  Borrower shall satisfy the requirements and/or provide to Administrative Agent each of the following documents, instruments, agreements and information set out below, in form and substance acceptable to Administrative Agent, on or before the date specified for such requirement or such later date to be determined by Administrative Agent in its sole and absolute discretion, each of which shall be completed or provided in form and substance satisfactory to Administrative Agent:

10.10.1   <u>Account Pledge Agreement</u>.  The Borrower shall provide a duly executed Account Pledge Agreement within 10 Business Days of the Closing Date.

10.10.2   <u>REIT Share Charges</u>.  The Borrower shall lodge instrument(s) of charge in connection with the REIT Share Charges on the respective date of expiry of each of the First Lock-up Period and Second Lock-up Period.

SECTION 11  NEGATIVE COVENANTS

Until the expiration or termination of the Commitments and thereafter until all Obligations hereunder and under the other Loan Documents are paid in full, Borrower agrees that, unless at any time the Required Lenders shall otherwise expressly consent in writing, it will:

11.1   <u>Debt</u>.  Not, and not permit any Subsidiary to, create, incur, assume or suffer to exist any Debt, except:

(a)   Obligations under this Agreement and the other Loan Documents;

(b)   Obligations under the Related Documents; and

(c)   Hedging Obligations approved by Administrative Agent and incurred in favor of a Lender or an Affiliate thereof for bona fide hedging purposes and not for speculation.

11.2   <u>Liens</u>.  Not, and not permit any Subsidiary to, create or permit to exist any Lien on any of its real or personal properties, assets or rights of whatsoever nature (whether now owned or hereafter acquired), except:

(a)   Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and, in each case, for which Borrower maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(b)   Liens arising in the ordinary course of business to the extent constituting (i) Liens of carriers, warehousemen, mechanics and materialmen arising as a matter of law, and (ii) Liens in the form of cash deposits or cash pledges incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with surety bonds, bids, performance bonds and similar obligations for sums not overdue or being diligently contested in good faith by appropriate proceedings and not involving any advances or

21

borrowed money or the deferred purchase price of property or services and, in each case, for which Borrower maintain adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(c)     attachments, appeal bonds, judgments and other similar Liens, for sums not exceeding $25,000 arising in connection with court or other legal proceedings, provided the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings;

(d)     easements, rights of way, restrictions, minor defects or irregularities in title, in each case solely affecting real property, none of which, individually or collectively, (i) interfere in any material respect with the ordinary conduct of the business of any Loan Party, or (ii) materially or adversely affect the value of the real property; and

(e)     Liens arising under the Loan Documents.

11.3    Mergers, Consolidations, Sales.  Not, and not permit any Subsidiary to, (a) be a party to any merger, amalgamation or consolidation, (b) sell, transfer, dispose of, convey or lease any of its assets or Capital Securities (including the sale of Capital Securities of any Subsidiary) except for sales of inventory in the ordinary course of business, or (c) sell or assign with or without recourse any receivables.

11.4    Modification of Organizational Documents.  Not permit the charter, by-laws or other organizational documents of Borrower to be amended or modified in any way which could reasonably be expected to materially adversely affect the interests of the Lenders; not change, or allow any Loan Party to change, its state of formation or its organizational form.

11.5    Transactions with Affiliates.  Not, and not permit any Subsidiary to, enter into, or cause, suffer or permit to exist any transaction, arrangement or contract with any of its other Affiliates (other than the Loan Parties) which is on terms which are less favorable than are obtainable from any Person which is not one of its Affiliates.

11.6    Inconsistent Agreements.  Not, and not permit any Loan Party with respect to clause (a) only, or any Subsidiary with respect to clauses (a), (b) and (c), to enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by Borrower hereunder or by the performance by any Loan Party of any of its Obligations hereunder or under any other Loan Document, (b) prohibit Borrower or any Subsidiary from granting to Administrative Agent and the Lenders, a Lien on any of its assets or (c) create or permit to exist or become effective any encumbrance or restriction on the ability of Borrower or any Subsidiary to (i) pay dividends or make other distributions to Borrower or any Subsidiary, or pay any Debt owed to Borrower or any Subsidiary, (ii) make loans or advances to any Loan Party or (iii) transfer any of its assets or properties to any Loan Party, other than, in each case, (x) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the assets of any Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (y) restrictions or conditions imposed by any agreement relating to purchase money Debt, Capital Leases and other secured Debt permitted by this Agreement if such restrictions or conditions apply only to the property or

22

assets securing such Debt and (z) customary provisions in leases and other contracts restricting the assignment thereof.

11.7    _Business Activities; Issuance of Equity_.  Not, and not permit any Subsidiary to, engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto.  Not, and not permit any Subsidiary to, issue any Capital Securities.

11.8    _Restriction of Amendments to Certain Documents_.  Not amend or otherwise modify, supplement, restate or waive any rights under any Related Agreement, other than immaterial amendments, modifications and waivers not adverse to the interests of Lenders.

11.9    _Financial Covenants_.  Not permit the Account Ratio to decrease to or below (i) prior to the exercise of a Cure Right, 1.40:1.0 and (ii) following the exercise of a Cure Right, 1.45:1.0 ("Trigger Event"). The Administrative Agent may calculate the Account Ratio from time to time, and in any event each Wednesday (provided that if such Wednesday is not a Business Day, the Business Day immediately preceding such Wednesday). If a Trigger Event occurs, Borrower shall promptly, but in any event no later than five (5) Business Days of the issuance of notice from the Administrative Agent of the occurrence of such Trigger Event, deposit cash into the Margin Account in an amount sufficient to increase the Account Ratio to at least 1.45:1.0 ("Cure Right").

11.10    _Compliance with Laws_.  Not, and not permit any other Loan Party to, fail to comply with the laws, regulations and executive orders referred to in Sections 9.21 and 9.22.

11.11    _Prohibited Person_.  Not, and not permit, any Loan Party or any of their respective affiliated entities to (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, or (ii) engage in or conspire to engage in any transaction that evades or avoids or that the purpose of evading or avoiding any of the prohibitions of the Anti-Terrorism Order.

11.12    _Ownership_.  Not, and not permit, any Loan Party or any of their respective affiliated entities to transfer direct or indirect ownership interests in (i) Borrower, (ii) LendCo SPV and (iii) the REIT Charged Shares, without the prior written consent of all Lenders (acting in their absolute discretion, save for limited transfers of the indirect ownership interests in Borrower where consent shall not be unreasonably withheld).

SECTION 12  EFFECTIVENESS; CONDITIONS OF LENDING, ETC.

The obligation of each Lender to make its Loans is subject to the following conditions precedent:

12.1    _Credit Extension_.  The obligation of the Lenders to make the Loans is subject to the conditions precedent specified in Sections 12.1 and 12.2, each duly executed and dated the Closing Date (or such earlier date as shall be satisfactory to Administrative Agent), in form and substance satisfactory to Administrative Agent (and the date on which all such conditions precedent have been satisfied, waived or deferred in writing by Administrative Agent and the Lenders is called the "Closing Date"):

12.1.1    <u>Agreement, Notes and other Loan Documents</u>.  This Agreement and, to the extent requested by any Lender, a Note made payable to such Lender, and all other Loan Documents (save for the Account Pledge Agreement).

12.1.2    <u>Authorization Documents</u>.  For each of the Borrower, Sponsor and REIT Chargor, such Person's (a) charter (or similar formation document), certified by the appropriate Governmental Authority; (b) good standing certificates in its state of incorporation (or formation) and in each other state requested by Administrative Agent; (c) bylaws (or similar governing document); (d) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; and (e) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.

12.1.3    <u>Consents, etc</u>.  Certified copies of all documents evidencing any necessary corporate or other entity action, consents and governmental approvals (if any) required for the execution, delivery and performance by the Loan Parties of the documents referred to in this <u>Section 12</u>.

12.1.4    <u>Letter of Direction</u>.  A letter of direction containing funds flow information with respect to the proceeds of the Loans on the Closing Date.

12.1.5    <u>Opinions of Counsel(s)</u>.  Opinions of counsel(s), including local counsel reasonably requested by Administrative Agent, in each case, addressed to Administrative Agent and the Lenders, in form and substance reasonably satisfactory to Administrative Agent.

12.1.6    <u>Copies of Documents</u>.  Copies of the Related Agreements certified by the secretary or assistant secretary (or similar officer) of Borrower as being true, accurate and complete.

12.1.7    <u>Payment of Fees</u>.  Evidence of payment by Borrower of all accrued and unpaid fees, costs and expenses to the extent then due and payable on the Closing Date, together with all Attorney Costs of Administrative Agent to the extent invoiced prior to the Closing Date, plus such additional amounts of Attorney Costs of Administrative Agent as shall constitute Administrative Agent's reasonable estimate of Attorney Costs incurred or to be incurred by Administrative Agent through the closing proceedings (provided that such estimate shall not thereafter preclude final settling of accounts between Borrower and Administrative Agent).

12.1.8    <u>Account Ratio.</u> The Administrative Agent shall be satisfied that the Account Ratio is at least 1.55:1.

12.1.9    <u>Financial Statements and Projections</u>.  (a) Financial statements and tax filings of the Borrower, LendCo SPV and Guarantors, each certified by an officer of the Borrower as being true, accurate and complete as of the Closing Date, which demonstrate in Administrative Agent's reasonable judgment, together with all other information then

available to Administrative Agent, that the Borrower, LendCo SPV and Guarantors can generally repay their debts and satisfy their other obligations as and when they become due, and can comply with the financial covenants in this Agreement, (b) an organizational chart of each Loan Party listing all persons and entities reasonably requested by the Lenders certified by the Borrower as being true and accurate, and (c) all other related documents and agreements and business history (including, without limitation, references, credit and other background reports and searches) of each Loan Party and such information as Administrative Agent may reasonably request to confirm the tax, legal and business assumptions made in such pro forma and projected financial statements.

12.1.10    <u>Search Results</u>.  Copies of Uniform Commercial Code search reports dated a date reasonably near to the Closing Date, listing all effective financing statements which name any Loan Party as debtors, together with copies of such financing statements.

12.1.11    <u>Filings, Registrations and Recordings</u>.  Administrative Agent shall have received each document (including Uniform Commercial Code financing statements) required by the Collateral Documents or under law or reasonably requested by Administrative Agent to be filed, registered or recorded in order to create in favor of Administrative Agent, for the benefit of the Lenders, a perfected Lien on the collateral described therein, prior to any other Liens (subject only to Liens permitted pursuant to <u>Section 11.2</u>), in proper form for filing, registration or recording.

12.1.12    <u>Closing Certificate, Consents and Permits</u>.  A certificate executed by an officer of Borrower certifying the matters set forth in <u>Section 12.2.1</u> as of the Closing Date.

12.1.13    <u>Singapore documents.</u> The (i) executed but undated documents required pursuant to clause 4.1 of each REIT Charge; (ii) latest CDP statement of each REIT Chargor evidencing ownership of the relevant Collateral; and (iii) breakdown of the Collateral to be released at the expiry of the First Lock-up Period and the Second Lock-up Period.

12.1.14    <u>No Material Adverse Change</u>.  There shall not have occurred since December 31, 2018, any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect.

12.1.15    <u>Know your client</u>.  Each Lender shall have satisfactorily completed any "know your customer" checks.

12.1.16    <u>Diligence</u>.  Administrative Agent shall have received all due diligence materials as Administrative Agent has requested and Administrative Agent shall have found such due diligence satisfactory to it, including, without limitation, material contracts.

12.1.17    <u>Financial Condition</u>.  Administrative Agent shall have completed a satisfactory examination of the financial condition of the Loan Parties, including, without limitation, review of the books, records and assets of the Loan Parties.

12.1.18   <u>Approvals</u>.   Administrative Agent shall have received approval of its executive credit committee.

12.1.19   <u>Foreign Investors</u>.   Lenders shall have received the names of any foreign investors (individuals or entities) holding 20% or more of the direct and/or indirect interest in Borrower together with any tax identification numbers and other such identification numbers or information required by a Lender to complete its internal foreign investor due diligence.

12.1.20   <u>Consents</u>.   Loan Parties shall have obtained all necessary governmental, regulatory, creditor, shareholder, partner and other material consents, approvals and exemptions required to be obtained by Loan Parties in connection with the transactions contemplated hereby.

12.1.21   <u>Other</u>.   Such other documents as Administrative Agent or any Lender may reasonably request.

The acceptance by Borrower of any Loans made on the Closing Date shall be deemed to be a representation and warranty made by Borrower to the effect that all of the conditions precedent to the making of the Loans have been satisfied.  Execution and delivery to Administrative Agent by a Lender of a counterpart of this Agreement shall be deemed confirmation by such Lender that (i) all conditions precedent in this <u>Section 12.1</u> have been fulfilled to the satisfaction of such Lender, (ii) the decision of such Lender to execute and deliver to Administrative Agent an executed counterpart of this Agreement was made by such Lender independently and without reliance on Administrative Agent or any other Lender as to the satisfaction of any condition precedent set forth in this <u>Section 12.1</u>, and (iii) all documents, instruments and agreements made available to such Lender were acceptable to such Lender.

12.2   <u>Conditions</u>.   The obligation of each Lender to make each Loan is subject to the following further conditions precedent that:

12.2.1   <u>Compliance with Warranties, No Default, etc</u>.   Both before and after giving effect to any borrowing, the following statements shall be true and correct:

(a)   the representations and warranties of each Loan Party set forth in this Agreement and the other Loan Documents shall be true and correct in all respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date); and

(b)   no Default or Event of Default shall have then occurred and be continuing.

12.2.2   <u>Confirmatory Certificate</u>.   If requested by Administrative Agent or any Lender, Administrative Agent shall have received a certificate dated the date of such requested Loan and signed by a duly authorized representative of Borrower as to the matters set out in <u>Section 12.2.1</u> (it being understood that each request by Borrower for the making of a Loan shall be deemed to constitute a representation and warranty by Borrower that the conditions precedent set forth in <u>Section 12.2.1</u> will be satisfied at the time of the

26

making of such Loan), together with such other documents as Administrative Agent may reasonably request in support thereof.

## SECTION 13  EVENTS OF DEFAULT AND THEIR EFFECT.

13.1    <u>Events of Default</u>.  Each of the following shall constitute an Event of Default under this Agreement:

13.1.1    <u>Non-Payment of the Loans, etc</u>.  Default in the payment when due of the principal of any Loan; or default, and continuance thereof for three days, in the payment when due of any interest, fee or other amount payable by any Loan Party hereunder or under any other Loan Document.

13.1.2    <u>Non-Payment of Other Debt</u>.  Any default shall occur under the terms applicable to any Debt of any Loan Party in an aggregate amount (for all such Debt so affected and including undrawn committed or available amounts and amounts owing to all creditors under any combined or syndicated credit arrangement) exceeding $100,000 and such default shall (a) consist of the failure to pay such Debt when due, whether by acceleration or otherwise, or (b) accelerate the maturity of such Debt or permit the holder or holders thereof, or any trustee or agent for such holder or holders, to cause such Debt to become due and payable (or require any Loan Party to purchase or redeem such Debt or post cash collateral in respect thereof) prior to its expressed maturity.

13.1.3    <u>Bankruptcy, Insolvency, etc</u>.  Any Loan Party becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or any Loan Party applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Loan Party or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for any Loan Party or for a substantial part of the property of any thereof and is not discharged within 60 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of any Loan Party, and if such case or proceeding is not commenced by such Loan Party, it is consented to or acquiesced in by such Loan Party, or remains for 60 days undismissed; or any Loan Party takes any action to authorize, or in furtherance of, any of the foregoing.

13.1.4    <u>Non-Compliance with Loan Documents</u>.  (a) Failure by any Loan Party to comply with or to perform any covenant set forth in <u>Sections 8.5</u>, <u>10.1</u>, <u>10.3</u>, <u>10.5</u>, <u>10.10</u> or <u>Section 11</u> or section 13 of the Guaranty; or (b) failure by any Loan Party to comply with or to perform any other provision of this Agreement or any other Loan Document (and not constituting an Event of Default under any other provision of this <u>Section 13</u>) and continuance of such failure described in this <u>clause (b)</u> for 30 days.

13.1.5    <u>Representations; Warranties</u>.  Any representation or warranty made by any Loan Party herein or in any other Loan Document is breached or is false or misleading in any material respect (except to the extent such representation or warranty is qualified by

27

materiality or Material Adverse Effect, in which case, in any respect), or any schedule, certificate, financial statement, report, notice or other writing furnished by any Loan Party to Administrative Agent or any Lender in connection herewith is false or misleading in any material respect (except to the extent such representation or warranty is qualified by materiality or Material Adverse Effect, in which case, in any respect) on the date as of which the facts therein set forth are stated or certified.

13.1.6    Pension Plans.  (a) Any Person institutes steps to terminate a Pension Plan if as a result of such termination any Loan Party or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $100,000; (b) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA; (c) the Unfunded Liability exceeds twenty percent of the Total Plan Liability, or (d) there shall occur any withdrawal or partial withdrawal from a Multiemployer Pension Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Pension Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Loan Party or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $100,000.

13.1.7    Judgments.  Final judgments, settlements or awards which exceed an aggregate of $100,000 shall be rendered against any Loan Party and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within 30 days after entry or filing of such judgments, settlements or awards.

13.1.8    Invalidity of Collateral Documents, etc.  Any Collateral Document shall cease to be in full force and effect; or any Loan Party (or any Person by, through or on behalf of any Loan Party) shall contest in any manner the validity, binding nature or enforceability of any Collateral Document.

13.1.9    Change of Control.  A Change of Control shall occur.

13.1.10    Material Adverse Effect.  The occurrence of any event having a Material Adverse Effect.

13.2    Effect of Event of Default.  If any Event of Default described in Section 13.1.3 shall occur, the Commitments shall immediately terminate and the Loans and all other Obligations hereunder shall become immediately due and payable; and, if any other Event of Default shall occur and be continuing, Administrative Agent may (and, upon the written request of the Required Lenders shall) declare the Commitments to be terminated in whole or in part and/or declare all or any part of the Loans and all other Obligations hereunder to be due and payable, whereupon the Commitments shall immediately terminate (or be reduced, as applicable) and/or the Loans and other Obligations hereunder shall become immediately due and payable (in whole or in part, as applicable).

13.3    Credit Bidding. The Loan Parties and the Lenders hereby irrevocably authorize Administrative Agent, based upon the instruction of the Required Lenders, to Credit Bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the

Collateral (and the Loan Parties shall approve Administrative Agent as a qualified bidder and such Credit Bid as a qualified bid) at any sale thereof conducted by Administrative Agent, based upon the instruction of the Required Lenders, under any provisions of the Uniform Commercial Code, as part of any sale or investor solicitation process conducted by any Loan Party, any interim receiver, receiver, receiver and manager, administrative receiver, trustee, agent or other Person pursuant or under any insolvency laws; provided, however, that the Required Lenders may not direct Administrative Agent in any manner that does not treat each of the Lenders ratably, without preference or discrimination, in respect of consideration received as a result of the Credit Bid. Such Credit Bid or purchase may be completed through one or more acquisition vehicles formed by Administrative Agent to make such Credit Bid or purchase and, in connection therewith, Administrative Agent is authorized, on behalf of the Lender Parties, to adopt documents providing for the governance of the acquisition vehicle or vehicles, and assign the applicable Obligations to any such acquisition vehicle in exchange for equity and/or debt issued by the applicable acquisition vehicle (which shall be deemed to be held for the ratable account of the applicable Lender Parties on the basis of the Obligations so assigned by each Lender Party); provided that any actions by Administrative Agent with respect to such acquisition vehicle, including any disposition of the assets or equity thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions of the Required Lenders in Section 15.1.

For purposes of the preceding sentence, the term "Credit Bid" shall mean, an offer submitted by Administrative Agent (on behalf of the Lender group), based upon the instruction of the Required Lenders, to acquire the property of any Loan Party or any portion thereof in exchange for and in full and final satisfaction of all or a portion (as determined by Administrative Agent, based upon the instruction of the Required Lenders) of the claims and Obligations under this Agreement and other Loan Documents.

SECTION 14  THE ADMINISTRATIVE AGENT.

14.1    Appointment and Authorization.    Each Lender hereby irrevocably (subject to Section 14.10) appoints, designates and authorizes Administrative Agent to take any action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise any powers and perform any duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, Administrative Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in other Loan Documents with reference to Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

29

14.2    Delegation of Duties.  Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects.

14.3    Exculpation of Administrative Agent.  None of Administrative Agent nor any of its directors, officers, employees, advisors, counsel or agents shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except to the extent resulting from Administrative Agent's own gross negligence or willful misconduct in connection with its duties expressly set forth herein as determined by a final, nonappealable judgment by a court of competent jurisdiction), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or Affiliate of Borrower, or any officer thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document (or the creation, perfection or priority of any Lien or security interest therein), or for any failure of Borrower or any other party to any Loan Document to perform its Obligations hereunder or thereunder.  Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of Borrower or any of Borrower's Subsidiaries or Affiliates.

14.4    Reliance by Administrative Agent.  Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, electronic mail message, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower), independent accountants and other experts selected by Administrative Agent.  Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, confirmation from the Lenders of their obligation to indemnify Administrative Agent against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon each Lender.  For purposes of determining compliance with the conditions specified in Section 12, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender.

14.5    Notice of Default.  Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default or Default, unless Administrative Agent shall

30

have received written notice from a Lender or Borrower referring to this Agreement, describing such Event of Default or Default and stating that such notice is a "notice of default". Administrative Agent will notify the Lenders of its receipt of any such notice. Administrative Agent shall take such action with respect to such Event of Default or Default as may be requested by the Required Lenders in accordance with Section 13; provided that unless and until Administrative Agent has received any such request, Administrative Agent may (but shall not be obligated to) take any action, or refrain from taking any action, with respect to such Event of Default or Default as it shall deem necessary, desirable or advisable or in the best interest of the Lenders.

14.6    Credit Decision. Each Lender acknowledges that Administrative Agent has not made any representation or warranty to it, and that no act by Administrative Agent hereafter taken, including any consent and acceptance of any assignment or review of the affairs of the Loan Parties, shall be deemed to constitute any representation or warranty by Administrative Agent to any Lender as to any matter, including whether Administrative Agent has disclosed material information in its possession. Each Lender represents to Administrative Agent that it has, independently and without reliance upon Administrative Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties, and made its own decision to enter into this Agreement and to extend credit to Borrower hereunder. Each Lender also represents that it will, independently and without reliance upon Administrative Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower. Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of Borrower which may come into the possession of Administrative Agent.

14.7    Indemnification. Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand Administrative Agent and each of Administrative Agent's Lender Parties (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so), according to its applicable Pro Rata Share, from and against any and all Indemnified Liabilities (as hereinafter defined); provided that no Lender shall be liable for any payment to any such Person of any portion of the Indemnified Liabilities to the extent determined by a final, nonappealable judgment by a court of competent jurisdiction to have resulted from the applicable Person's own gross negligence or willful misconduct. No action taken in accordance with the request or directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section. Without limitation of the foregoing, each Lender shall reimburse Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs and Taxes) incurred by or imposed on Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Administrative Agent is not reimbursed for such expenses

by or on behalf of Borrower.  The undertaking in this Section shall survive repayment of the Loans, cancellation of the Notes, any foreclosure under, or modification, release or discharge of, any or all of the Collateral Documents, termination of this Agreement and the resignation or replacement of Administrative Agent.

14.8    <u>Administrative Agent in Individual Capacity</u>.    Mirae Asset Securities & Investments (USA), LLC ("<u>MASI</u>") and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Capital Securities in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Loan Parties and Affiliates as though MASI were not Administrative Agent hereunder and without notice to or consent of any Lender.  Each Lender acknowledges that, pursuant to such activities, MASI or its Affiliates may receive information regarding Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of Borrower or such Affiliate) and acknowledges that Administrative Agent shall be under no obligation to provide such information to them.  With respect to their Loans (if any), MASI and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though MASI were not Administrative Agent, and the terms "Lender" and "Lenders" include MASI and its Affiliates, to the extent applicable, in their individual capacities.

14.9    <u>Successor Administrative Agent</u>.    Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders.  If Administrative Agent resigns under this Agreement, the Required Lenders shall, with (so long as no Default or Event of Default exists) the consent of Borrower (which shall not be unreasonably withheld or delayed), appoint from among the Lenders a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor agent, and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Section 14</u> and <u>Sections 15.5</u> and <u>15.17</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.  If no successor agent has accepted appointment as Administrative Agent by the date which is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Required Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

14.10    <u>Collateral Matters</u>.  Each Lender authorizes and directs Administrative Agent to enter into the other Loan Documents for the benefit of Lenders.  Each Lender hereby agrees that any action taken by Administrative Agent or Required Lenders in accordance with the provisions of this Agreement or the other Loan Documents, and the exercise by Administrative Agent or Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all Lenders.  Administrative Agent is hereby authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or Loan Documents which may be necessary to create, perfect and maintain perfected the Liens upon the

32

Collateral granted pursuant to this Agreement and the other Loan Documents. The Lenders irrevocably authorize Administrative Agent, at its option and in its sole and absolute discretion, (a) to release any Lien granted to or held by Administrative Agent under any Collateral Document (i) upon termination of the Commitments and payment in full of all Loans and all other outstanding obligations of Borrower hereunder (other than contingent obligations); (ii) constituting property sold or to be sold or disposed of as part of or in connection with any disposition permitted hereunder (including the release of any guarantor); or (iii) subject to <u>Section 15.1</u>, if approved, authorized or ratified in writing by the Required Lenders; or (b) to subordinate its interest in any Collateral to any holder of a Lien on such Collateral which is permitted by <u>Section 11.2(d)</u> (it being understood that Administrative Agent may conclusively rely on a certificate from Borrower in determining whether the Debt secured by any such Lien is permitted by <u>Section 11.1(b)</u>). Upon request by Administrative Agent at any time, the Lenders will confirm in writing Administrative Agent's authority to release, or subordinate its interest in, particular types or items of Collateral pursuant to this <u>Section 14.11</u>.

14.11   <u>Restriction on Actions by Lenders</u>. Each Lender agrees that it shall not, without the express written consent of Administrative Agent, and shall, upon the written request of Administrative Agent (to the extent it is lawfully entitled to do so), set off against the Obligations, any amounts owing by such Lender to a Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Administrative Agent, take or cause to be taken, any action, including, without limitation, any commencement of any legal or equitable proceedings, to foreclose any Loan or otherwise enforce any security interest in any of the Collateral or to enforce all or any part of this Agreement or the other Loan Documents. All enforcement actions under this Agreement and the other Loan Documents against the Loan Parties or any third party with respect to the Obligations or the Collateral or otherwise may only be taken by Administrative Agent (at the direction of the Required Lenders or as otherwise permitted in this Agreement) or by its agents at the direction of Administrative Agent.

14.12   <u>Administrative Agent May File Proofs of Claim</u>. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

      (a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary, desirable or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel and all other amounts due the Lenders and Administrative Agent under <u>Sections 5</u>, <u>15.5</u> and <u>15.17</u>) allowed in such judicial proceedings; and

      (b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

33

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under <u>Sections 5, 15.5 and 15.17</u>.

14.13   <u>Other Agents; Arrangers and Managers</u>.   None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "documentation agent," "co-agent," "book manager," "lead manager," "arranger," "lead arranger" or "co-arranger," if any, shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, in the case of such Lenders, those applicable to all Lenders as such.   Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender.   Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 15  GENERAL.

15.1   <u>Waiver; Amendments</u>.   No delay on the part of Administrative Agent or any Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.   No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by the Required Lenders, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.   No amendment, modification, waiver or consent shall (a) extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default or mandatory prepayment shall not constitute an increase or extension of any Commitment hereunder), (b) extend the date scheduled for payment of any principal of (excluding extension or waiver of mandatory prepayments) or interest on the Loans (other than the extension or waiver of default interest) or any fees payable hereunder without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent or the waiver of any Default or Event of Default shall not constitute a postponement, waiver or extension of any payment), (c) reduce the principal amount of any Loan, the rate of interest thereon (other than the reduction or waiver of default interest) or any fees payable hereunder, without the consent of each Lender directly and adversely affected thereby, or (d) release all or substantially all of the guarantors from their guarantee obligations under the Guaranty and Collateral Agreement (other than as part of or in connection with any disposition permitted hereunder or as permitted by <u>Section 14.11</u> or any such release by Administrative Agent in connection with any sale or other disposition upon the exercise of remedies under the Loan Documents) or all or substantially all of the Collateral granted under the Collateral Documents (except as permitted by <u>Section 14.11</u> or any such release by Administrative Agent in connection with any sale or other disposition upon the exercise of remedies under the Loan Documents), change the definition of Required Lenders or any provision

34

of this <u>Section 15.1</u>, or reduce the aggregate Pro Rata Share required to effect an amendment, modification, waiver or consent, without, in each case set forth in this clause (d), the written consent of all Lenders. No provision of <u>Section 14</u> or other provision of this Agreement affecting Administrative Agent in its capacity as such shall be amended, modified or waived without the consent of Administrative Agent.

If, in connection with any proposed amendment, modification, waiver or termination requiring the consent of all Lenders, the consent of the Required Lenders is obtained, but the consent of other Lenders whose consent is required is not obtained (any such Lender (excluding Administrative Agent or an Affiliate thereof) whose consent is not obtained being referred to as a "<u>Non-Consenting Lender</u>"), then, Administrative Agent and/or a Person or Persons reasonably acceptable to Administrative Agent shall have the right to (but shall not be obligated to) purchase from such Non-Consenting Lenders, and such Non-Consenting Lenders agree that they shall, upon Administrative Agent's request, sell and assign to Administrative Agent and/or such Person or Persons, all of the Loans of such Non-Consenting Lenders for an amount equal to the principal balance of all such Loans held by such Non-Consenting Lenders and all accrued interest, fees, expenses and other amounts then due with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement.

15.2    <u>Confirmations</u>.  Borrower and each holder of a Note agree from time to time, upon written request received by it from the other, to confirm to the other in writing (with a copy of each such confirmation to Administrative Agent) the aggregate unpaid principal amount of the Loans then outstanding under such Note.

15.3    <u>Notices</u>.  Except as otherwise provided in <u>Section 2.2.2</u> , all notices hereunder shall be in writing (including facsimile transmission) and shall be sent to the applicable party at its address shown on <u>Annex B</u> or at such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose.  Notices sent by facsimile transmission shall be deemed to have been given when sent; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier service shall be deemed to have been given when received.  For purposes of <u>Section 2.2</u>, Administrative Agent shall be entitled to rely on telephonic instructions from any person that Administrative Agent in good faith believes is an authorized officer or employee of Borrower, and Borrower shall hold Administrative Agent and each other Lender harmless from any loss, cost or expense resulting from any such reliance.

15.4    <u>Computations</u>.  Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement, such determination or calculation shall, to the extent applicable and except as otherwise specified in this Agreement, be made in accordance with GAAP, consistently applied; <u>provided</u> that if Borrower notifies Administrative Agent that Borrower wishes to amend any covenant in <u>Sections 10</u> or <u>11.14</u> (or any related definition) to eliminate or to take into account the effect of any change in GAAP on the operation of such covenant (or if Administrative Agent notifies Borrower that the Required Lenders wish to amend <u>Sections 10</u> or <u>11.14</u> (or any related definition) for such purpose), then Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect

35

immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant (or related definition) is amended in a manner satisfactory to Borrower and the Required Lenders.  All financial statements delivered hereunder shall be prepared without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.  For the purposes of Sections 12 and 13, a breach of a covenant contained in Section 11.14 shall be deemed to have occurred as of any date of determination by Administrative Agent and as of the last day of any specified period of measurement regardless of whether or when the financial statements reflecting such breach are delivered to Administrative Agent.

15.5    Costs, Expenses and Taxes.  Each Loan Party, jointly and severally agrees to pay on demand all out-of-pocket costs and expenses of Administrative Agent (including Attorney Costs and any Taxes) in connection with the preparation, execution, processing, underwriting, documentation, closing, syndication, delivery and administration (including perfection and protection of any Collateral and the costs of Intralinks (or other similar service), if applicable) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable out-of-pocket costs and expenses (including Attorney Costs, all other third party costs and expenses and any Taxes) incurred by Administrative Agent in connection with the collection of the Obligations or the enforcement of this Agreement, the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof or any proposed transfer pursuant to Section 11.12.  In addition, each Loan Party agrees to pay, and to save Administrative Agent harmless from all liability for, any fees of Borrower's auditors in connection with any reasonable exercise by Administrative Agent of its rights pursuant to Section 10.2.  All Obligations provided for in this Section 15.5 shall survive repayment of the Loans, cancellation of the Notes and termination of this Agreement.

15.6    Assignments; Participations.

15.6.1    Assignments.  (a) Any Lender may at any time assign to one or more Persons (any such Person, an "Assignee") all or any portion of such Lender's Loans and Commitments, with the prior written consent of Administrative Agent  and Borrower (which consent of Borrower shall not be unreasonably withheld or delayed), provided, however, consent of Borrower shall not be required (x) for an assignment by a Lender (i) to a Lender or an Affiliate of a Lender or an Approved Fund, or (ii) prior to the completion of the primary syndication of the Loans and Commitments as determined by Administrative Agent, or (y) during the existence of a Default or an Event of Default.  Except as Administrative Agent may otherwise agree, any such assignment shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the remaining Commitment and Loans held by the assigning Lender.  Borrower and Administrative Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Assignee until Administrative Agent shall have received and accepted an effective assignment agreement in substantially the form of Exhibit B hereto (an "Assignment Agreement") executed, delivered and fully completed by the applicable parties thereto and, unless waived by Administrative Agent in its sole and absolute

discretion, a processing fee of $3,500.  No assignment may be made to any Person if at the time of such assignment Borrower would be obligated to pay any greater amount under Sections 7.6 or 8 to the Assignee than Borrower are then obligated to pay to the assigning Lender under such Sections (and if any assignment is made in violation of the foregoing, Borrower will not be required to pay such greater amounts).  Any attempted assignment not made in accordance with this Section 15.6.1 shall be treated as the sale of a participation under Section 15.6.2.  Borrower shall be deemed to have granted its consent to any assignment requiring its consent hereunder unless Borrower has expressly objected to such assignment within three Business Days after notice thereof.

(b)    From and after the date on which the conditions described above have been met, (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights (other than its indemnification rights) and obligations hereunder.  Upon the request of the Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrower shall execute and deliver to Administrative Agent for delivery to the Assignee (and, as applicable, the assigning Lender) Notes in the principal amount of the Assignee's Loans (and, as applicable, Notes in the principal amount of the Loans retained by the assigning Lender).  Each such Note shall be dated the effective date of such assignment.

(c)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

15.6.2    Participations.  Any Lender may at any time sell to one or more Persons participating interests in its Loans, Commitments or other interests hereunder (any such Person, a "Participant").  In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder shall remain unchanged for all purposes, (b) Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (c) all amounts payable by Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 15.1 expressly requiring the unanimous vote of all Lenders or, as applicable, all directly and adversely affected Lenders.  Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement which such Lender enters into with any Participant.  Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest

37

in amounts owing under this Agreement; provided that such right of set-off shall be subject to the obligation of each Participant to share with the Lenders, and the Lenders agree to share with each Participant, as provided in Section 7.5. Borrower also agrees that each Participant shall be entitled to the benefits of Section 7.6 or 8 as if it were a Lender (provided that on the date of the participation no Participant shall be entitled to any greater compensation pursuant to Section 7.6 or 8 than would have been paid to the participating Lender on such date if no participation had been sold and that each Participant complies with Section 7.6(d) as if it were an Assignee).

15.7    Register. Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain a copy of each Assignment Agreement delivered and accepted by it and register (the "Register") for the recordation of names and addresses of the Lenders and the Commitment of each Lender from time to time and whether such Lender is the original Lender or the Assignee. No assignment shall be effective unless and until the Assignment Agreement is accepted and registered in the Register. All records of transfer of a Lender's interest in the Register shall be conclusive, absent manifest error, as to the ownership of the interests in the Loans. Administrative Agent shall not incur any liability of any kind with respect to any Lender with respect to the maintenance of the Register.

15.8    GOVERNING LAW. **THIS AGREEMENT AND EACH NOTE SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAW OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.**

15.9    Confidentiality. As required by federal law and Administrative Agent's policies and practices, Administrative Agent may need to obtain, verify, and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services. Administrative Agent and each Lender agree to use commercially reasonable efforts (equivalent to the efforts Administrative Agent or such Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to them by any Loan Party and designated as confidential, except that Administrative Agent and each Lender may disclose such information (a) to Persons employed or engaged by Administrative Agent or such Lender or such Lender's Affiliates or Approved Funds in evaluating, approving, structuring or administering the Loans and the Commitments; (b) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 15.9 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by Administrative Agent or such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Administrative Agent's or such Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which Administrative Agent or such Lender is a party; (f) to any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such

38

Lender; (g) to Lender's independent auditors and other professional advisors as to which such information has been identified as confidential; or (h) that ceases to be confidential through no fault of Administrative Agent or any Lender.  Notwithstanding the foregoing, Borrower consents to the publication by Administrative Agent or any Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and Administrative Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.  If any provision of any confidentiality agreement, non-disclosure agreement or other similar agreement between Borrower, on the one hand, and Administrative Agent or a Lender, on the other side, conflicts with or contradicts this Section 15.9 with respect to the treatment of confidential information, this section shall supersede all such prior or contemporaneous agreements and understandings between the parties.

15.10  Severability.   Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

15.11  Nature of Remedies.    All obligations of the Loan Parties and rights of Administrative Agent and the Lenders expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law.  No failure to exercise and no delay in exercising, on the part of Administrative Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights and remedies of Administrative Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise.

15.12  Entire Agreement.   This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof (except as relates to the fees described in Section 5.3) and any prior arrangements made with respect to the payment by the Loan Parties of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Administrative Agent or the Lenders.

15.13  Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.   Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by the Lenders shall deemed to be originals.

15.14  Successors and Assigns.  This Agreement shall be binding upon Borrower, the Lenders and Administrative Agent and their respective successors and assigns, and shall inure to the benefit of Borrower, the Lenders, Administrative Agent, the Lender Parties and the successors

and assigns of the Lenders and Administrative Agent.  No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  No Loan Party may assign or transfer any of its rights or Obligations under this Agreement without the prior written consent of Administrative Agent and each Lender.

15.15    <u>Captions</u>.  Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

15.16    <u>Customer Identification – USA Patriot Act Notice</u>.    Each Lender and Administrative Agent (for itself and not on behalf of any other party) hereby notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender or Administrative Agent, as applicable, to identify the Loan Parties in accordance with the Act.

15.17    <u>INDEMNIFICATION BY LOAN PARTIES</u>.  **IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY ADMINISTRATIVE AGENT AND THE LENDERS AND THE AGREEMENT TO EXTEND THE COMMITMENTS PROVIDED HEREUNDER, BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD EACH LENDER PARTY FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "<u>INDEMNIFIED LIABILITIES</u>"), INCURRED BY THE LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (a) ANY TENDER OFFER, MERGER, PURCHASE OF CAPITAL SECURITIES, PURCHASE OF ASSETS (INCLUDING THE RELATED TRANSACTION) OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOANS, (b) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED AT ANY TIME BY ANY LOAN PARTY, (c) ANY VIOLATION, OBLIGATION OR LIABILITY IN CONNECTION WITH ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY AT ANY TIME OR THE OPERATIONS CONDUCTED THEREON, (d) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR OTHERWISE BE LIABLE UNDER ENVIRONMENTAL LAWS OR (e) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF THE LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES TO THE EXTENT ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF**

40

**COMPETENT JURISDICTION OR (d) ANY COMPENSATION (INCLUDING WITHOUT LIMITATION, ANY BROKER OR FINDER FEES) SOUGHT BY ANY PARTY WHO MAKES A CLAIM TO THE LENDER PARTIES FOR SUCH COMPENSATION OR COMMISSION RELATING TO THE LOANS BASED ON ACTUAL OR ALLEGED DEALINGS WITH BORROWER OR ANY OTHER LOAN PARTY OR ANY OF THEIR RESPECTIVE AFFILIATES. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, BORROWER HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 15.17</u> SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.**

    15.18    <u>Nonliability of Lenders</u>.  The relationship between Borrower on the one hand and the Lenders and Administrative Agent on the other hand shall be solely that of Borrower and lender.  Neither Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, on the one hand, and Administrative Agent and the Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.  Neither Administrative Agent nor any Lender undertakes any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations.  Borrower agrees, on behalf of itself and each other Loan Party, that neither Administrative Agent nor any Lender shall have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  **NO LENDER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT OR OTHER LOAN DOCUMENTS, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND BORROWER ON BEHALF OF ITSELF AND EACH OTHER LOAN PARTY, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).**  Each Loan Party acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party.  No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or Administrative Agent or among the Loan Parties, Administrative Agent and the Lenders.  Execution of this Agreement by any Loan Party

41

constitutes a full, complete and irrevocable release of any and all claims which such Loan Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.

15.19 <u>FORUM SELECTION AND CONSENT TO JURISDICTION</u>. **ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, NEW YORK COUNTY, OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ADMINISTRATIVE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. EACH LOAN PARTY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

15.20 <u>WAIVER OF JURY TRIAL</u>. **EACH LOAN PARTY, ADMINISTRATIVE AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

15.21 <u>REIT Charged Shares</u>. Administrative Agent and the Lenders hereby agree not to enforce the charge, security or encumbrance over the REIT Charged Shares pursuant to the REIT Share Charges over (a) 100.0% of the REIT Charged Shares during the First Lock-up Period, and (b) 50.0% of the REIT Charged Shares during the Second Lock-up Period. For the avoidance of doubt, at any time following the Second Lock-up Period, subject to the terms of the REIT Share Charges, Administrative Agent may enforce its rights and remedies thereunder over 100.0% of the REIT Charged Shares.

SECTION 16   ACKNOWLEDGMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS

16.1     Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(A)     a reduction in full or in part or cancellation of any such liability;

(B)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[SIGNATURE PAGES FOLLOW]

43

DocuSign Envelope ID: 9B5A71C5-3537-4726-8F5D-5DA920B64B5E

The parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**USA LendCo Holdings, LLC,**
a Delaware limited liability company
By: **US Hospitality Investments, LLC,**
a Delaware limited liability company, its Manager

By: _____
**Name:   Taylor Woods**
**Title:     Managing Member**

Signature Page to
Credit Agreement

SINGAPORE/#5424.7

**MIRAE ASSET SECURITIES &
INVESTMENTS (USA), LLC**,
as Administrative Agent

By:_____
Name: Youn Kwang Woo
Title: CEO

Signature Page to
Credit Agreement

**MIRAE ASSET SECURITIES &
INVESTMENTS (USA), LLC,**
as Lender

By:_____
Name: Youn Kwang Woo
Title: CEO

Signature Page to
Credit Agreement

ANNEX A

DEFINITIONS

"<u>Accordion Facility Increase</u>" means an increase in the "Aggregate Commitments" under the BAML Accordion Facility pursuant to Section 2.16 thereunder.

"<u>Account Pledge Agreement</u>" means the account pledge agreement dated on or after the Closing Date in respect of the Margin Account and the Prepositioned Interest Account between, amongst others, Borrower, as pledgor, and Administrative Agent.

"<u>Account Ratio</u>" means, as at any date of determination, the ratio of (a) the aggregate of (i) the Deposit Amount either (x) standing to the credit of the Margin Account; or (y) being withheld by the Lenders pursuant to Section 2.2.2 on such date; and (ii) the Market Value of the REIT Charged Shares to (b) the Loan outstanding on such date.

"<u>Administrative Agent</u>" is defined in the preamble of this Agreement.

"<u>Affiliate</u>" of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person and (b) any officer, manager or director of such Person.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Unless expressly stated otherwise herein, neither Administrative Agent nor any Lender shall be deemed an Affiliate of any Loan Party.

"<u>Agreement</u>" is defined in the preamble of this Agreement.

"<u>Approved Fund</u>" means (i) any Person (other than a natural person) engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is advised, administered, or managed by a Lender, an Affiliate of a Lender (or an entity or an Affiliate of an entity that administers, advises or manages a Lender); (ii) with respect to any Lender that is an investment fund, any other investment fund that invests in loans and that is advised, administered or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor; and (iii) any third party which provides "warehouse financing" to a Person described in the preceding clause (i) or (ii) (and any Person described in said clause (i) or (ii) shall also be deemed an Approved Fund with respect to such third party providing such warehouse financing).

"<u>Arrange Fee</u>" means an amount of $600,000.

"<u>Assignee</u>" is defined in <u>Section 15.6.1</u>.

"<u>Assignment Agreement</u>" is defined in Section <u>15.6.1</u>.

"Attorney Costs" means, with respect to any Person, all reasonable fees, costs and expenses of any counsel to such Person, all reasonable disbursements of such counsel and all court costs and similar legal expenses.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"BAML Accordion Facility" means the credit agreement between, amongst others, Bank of America, N.A. as administrative agent and U.S. funding agent and Eagle Hospitality Business Trust Management Pte. Ltd., in its capacity as trustee-manager of Eagle Hospitality Business Trust dated May 16, 2019.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.), as amended and in effect from time to time and the regulations issued from time to time thereunder.

"Beneficial Ownership Regulation" means 31 C.F.R. §1010.230, as amended.

"Borrower" is defined in the preamble of this Agreement.

"Borrower Parent" means each of (i) Jerome Yuan, an individual with identification number 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; and (ii) U.S. Hospitality Investments, LLC, a Delaware limited liability company, who are the sole members and managers of Borrower.

"BSA" is defined in Section 10.3.

"Business Day" means any day other than (i) a Saturday or Sunday or (ii) a day on which commercial banks are not authorized or required to close in New York City or Los Angeles, California.

"Capital Lease" means, with respect to any Person, any lease of (or other agreement conveying the right to use) any real or personal property by such Person that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Closing Date, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations or any other equivalent of such ownership interest.

"CFC" means a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"Change of Control" means the occurrence of any of the following events: (a) Borrower shall cease to directly, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, (i) own and control 100% of the outstanding Capital Securities of LendCo SPV or (ii) possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of LendCo SPV and to direct the management policies and decisions of LendCo SPV, (b) Borrower Parent shall cease to directly, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, (i) own and control 100% of the outstanding Capital Securities of Borrower or (ii) possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Borrower and to direct the management policies and decisions of Borrower, or (c) either Partner shall cease to directly, free and clear of all Liens, rights, options, warrants or similar agreements or understandings, own and control its respective REIT Charged Shares.

"Closing Date" is defined in Section 12.1.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means, collectively, "Charged Securities" (as defined in each REIT Share Charge), "Pledged Collateral" (as defined in the Membership Interest Pledge Agreement), "Account Pledge Collateral" (as defined in the Account Pledge Agreement) and any and all other property now or hereafter securing the Obligations.

"Collateral Documents" means, collectively, each REIT Share Charge, the Account Control Agreement, the Membership Interest Pledge Agreement, each control agreement and any other agreement or instrument pursuant to which Borrower, any Subsidiary or any other Person grants or purports to grant collateral to Administrative Agent for the benefit of the Lenders or otherwise relates to such collateral.

"Commitment" means, as to any Lender, such Lender's commitment to make the Loan under this Agreement.  The initial amount of each Lender's Commitment is set forth on Annex C.

"Commodity Exchange Act"  means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Contingent Liability" means, with respect to any Person, each obligation and liability of such Person and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person:  (a) guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, dividend, obligation or other liability of any other Person in any manner (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person; (c) undertakes or agrees (whether contingently or otherwise):  (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance

or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intent of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss.  The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"Controlled Group" means all members of a controlled group of corporations, all members of a controlled group of trades or businesses (whether or not incorporated) under common control and all members of an affiliated service group which, together with any Loan Party or any of its Subsidiaries, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person as lessee under Capital Leases which have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (d) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (e) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; provided that if such Person has not assumed or otherwise become liable for such indebtedness, such indebtedness shall be measured at the fair market value of such property securing such indebtedness at the time of determination, (f) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person, (g) all Hedging Obligations of such Person, (h) all Contingent Liabilities of such Person, (i) all Debt of any partnership of which such Person is a general partner, (j) all non-compete payment obligations, earn-outs and similar obligations and (k) any Capital Securities or other equity instrument, whether or not mandatorily redeemable, that under GAAP is characterized as debt, whether pursuant to financial accounting standards board issuance No. 150 or otherwise.

"Default" means any event that, if it continues uncured, will, with lapse of time or notice or both, constitute an Event of Default.

"Deposit Amount" means an amount equal to $1,250,000.

"Dollar" and the sign "$" mean lawful money of the United States of America.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Environmental Claims</u>" means all claims, however asserted, by any governmental, regulatory, or judicial authority or other Person alleging any potential liability or responsibility, contingent or otherwise (including for damages, losses, punitive damages, consequential damages, costs of environmental investigation and remediation, fines, penalties, indemnities or expenses) or other obligation, directly or indirectly resulting from or based upon (a) violation of or pursuant to any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Substances, (c) exposure to any Hazardous Substances, (d) the release or threatened release of any Hazardous Substances into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Environmental Laws</u>" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, <u>et</u> <u>seq</u>.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101, <u>et</u> <u>seq</u>.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, <u>et</u> <u>seq</u>.), the Federal Clean Water Act (33 U.S.C. § 1251 <u>et</u> <u>seq</u>.), the Clean Air Act (42 U.S.C. § 7401 <u>et</u> <u>seq</u>.), the Toxic Substances Control Act (15 U.S.C. § 2601 <u>et</u> <u>seq</u>.), the Safe Drinking Water Act (42 U.S.C. § 300f to 300j-26 <u>et</u> <u>seq</u>.), the Oil Pollution Act of 1990 (33 U.S.C. § 2701 <u>et</u> <u>seq</u>.) and the Occupational Safety and Health Act (29 U.S.C. § 651 <u>et</u> <u>seq</u>.), and any other present or future federal, state, local, foreign and other applicable statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions and common law relating to pollution, the protection of the environment, natural resources, human health or the release of any Hazardous Substances into the environment, including indoor and outdoor air, soil, groundwater, surface water, storm water, wetlands, sediment and discharges of wastewater to  public treatment systems, all as may be amended or otherwise modified from time to time.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Event of Default</u>" means any of the events described in <u>Section 13.1</u>.

"<u>Excluded Taxes</u>" means taxes based upon, or measured by, a Lender's or Administrative Agent's (or a branch of a Lender's or Administrative Agent's) overall net income, overall net

receipts, or overall net profits (including franchise taxes imposed in lieu of such taxes), but only to the extent such taxes are imposed by a taxing authority (a) in a jurisdiction in which such Lender or Administrative Agent is organized, (b) in a jurisdiction which a Lender's or Administrative Agent's principal office is located, or (c) in a jurisdiction in which such Lender's or Administrative Agent's lending office (or branch) in respect of which payments under this Agreement are made is located.

"Facilities" means, (i) where used in respect of and/or in connection with Section 15.17, at any time, the facilities or real properties owned, leased, managed or operated by any Loan Party, and (ii) where otherwise used solely the Borrower and its Subsidiaries.

"First Lock-up Period" has the meaning given to the same term set forth in the Prospectus dated 16 May 2019 (Registered with the Monetary Authority of Singapore on 16 May 2019) in connection with the initial public offering of Eagle Hospitality REIT Trust.

"Fiscal Quarter" means a fiscal quarter of a Fiscal Year.

"Fiscal Year" means the fiscal year of Borrower and its Subsidiaries, which period shall be the 12-month period ending on December 31 of each year.

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession) and the Securities and Exchange Commission, which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any federal, state or municipal court or other governmental department, commission, board, bureau, agency or instrumentality, governmental or quasi-governmental, domestic or foreign.

"Guarantor" means any of the Partners or the Sponsor, and "Guarantors" means all of them, as the context may require.

"Guaranty" means the Guaranty dated as of the Closing Date by the Guarantors, on a joint and several basis, in favor of Administrative Agent on behalf of itself and the Lenders.

"Hazardous Substances" means all explosive or radioactive substances, materials or waste and all hazardous waste, hazardous substance, pollutant, contaminant, toxic substance, oil, hazardous material, chemical or other substance regulated by any Environmental Law.

"Hedging Agreement" means any bank underwritten cash and/or derivative financial instrument including, but not limited to, any interest rate, currency or commodity swap agreement, cap agreement, collar agreement, spot foreign exchange, forward foreign exchange, foreign

Annex A – Page 6

exchange option (or series of options) and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligation" means, with respect to any Person, any liability of such Person under any Hedging Agreement.

"Indemnified Liabilities" is defined in Section 15.17.

"Intercompany Funding" shall mean any loans and/or share subscriptions made by any Borrower Parent (or its Affiliates) to the Borrower.

"Interest Rate" means a fixed rate of interest of 8.0% per annum.

"Interest Period" means the interest period as determined pursuant to Section 4.4.

"LendCo SPV" means Lodging USA LendCo, LLC, a Delaware limited liability company.

"LendCo SPV Loan" means the Loan Agreement dated May 16, 2019 between the LendCo SPV as lender and EHT US1, Inc. as borrower.

"LendCo SPV Note" has the meaning given to "Note" in the LendCo SPV Loan.

"Lender" is defined in the preamble of this Agreement.

"Lender Parties" means Administrative Agent, each Lender and each of the officers, directors, employees, advisors, Affiliates, Approved Funds and agents of Administrative Agent and each Lender.

"Lien" means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a Capital Lease) which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, title retention lien, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Loan Documents" means this Agreement, the Notes, the Guaranty, the Collateral Documents and all documents, instruments and agreements delivered in connection with the foregoing.

"Loan Party" means each of Borrower, the REIT Chargors, the Borrower Parents, the Guarantors, LendCo SPV and each Subsidiary.

"Loan Commitment" means, as to any Lender, such Lender's commitment to make Loans under this Agreement.  The amount of each Lender's Loan Commitment is set forth on Annex C. The aggregate amount of the Loan Commitments of all Lenders is the lesser of (i) $25,000,000 and (ii) 66.7% of the Market Value of the REIT Charged Shares determined on the Closing Date.

"Loans" is defined in Section 2.1.2.

"<u>Loan Maturity Date</u>" means the June 28, 2020.

"<u>Mandatory Prepayment Event</u>" is defined in <u>Section 6.1.2</u>.

"<u>Margin Account</u>" means the interest-bearing account in relation to the Deposit Amount in Borrower's name and controlled by Administrative Agent with Wells Fargo as notified by the Borrower to the Administrative Agent on or prior to the execution of the Account Pledge Agreement.

"<u>Margin Stock</u>" means any "margin stock" as defined in Regulation U.

"<u>Market Value</u>" means, in relation to the average closing price of the REIT Charged Shares on the applicable business day in Singapore as shown on the Singapore Exchange Securities Trading Limited (SGX-ST) (a) on the Closing Date, calculated based on the period commencing on its initial public offering and ending on June 27, 2019, and (b) thereafter, calculated based on the one week moving average for the period commencing on the date of determination of the prior week's Account Ratio to the Business Day immediately preceding the date of determination of current week's Account Ratio.

"<u>Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the financial condition, operations, assets, business, properties or prospects of the Loan Parties taken as a whole, (b) a material impairment of the ability of any Loan Party to perform any of the Obligations under any Loan Document, (c) a material adverse effect upon any of the Collateral under the Collateral Documents or upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or (d) a material impairment on the ability of Administrative Agent or any Lender to enforce rights or remedies under any Loan Document.

"<u>Membership Interest Pledge Agreement</u>" means the membership interest pledge agreement dated as of the Closing Date in respect of the membership interest in LendCo SPV by Borrower as pledgor in favor of Administrative Agent.

"<u>Multiemployer Pension Plan</u>" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which a Loan Party or any other member of the Controlled Group may have any liability.

"<u>Non-Consenting Lender</u>" is defined in <u>Section 15.1</u>.

"<u>Non-U.S. Participant</u>" is defined in <u>Section 7.6(d)</u>.

"<u>Note</u>" means a promissory note substantially in the form of <u>Exhibit A</u>.

"<u>Notice of Borrowing</u>" is defined in <u>Section 2.2</u>.

"<u>Obligations</u>" means (i) all Loans or other advances made by Administrative Agent and the Lenders to any Loan Party pursuant to this Agreement or the other Loan Documents, and (ii) all indebtedness, liabilities and obligations of every nature (monetary or otherwise) of any Loan Party under this Agreement and any other Loan Document, including, without limitation, any

reimbursement obligations of each Loan Party in respect of all Hedging Obligations permitted hereunder which are owed to any Lender (or its Affiliates) or Administrative Agent, all in each case howsoever created, arising or evidenced, whether direct or indirect (including those acquired by assumption), primary or secondary, absolute or contingent, now or hereafter existing, or due or to become due, including, without limitation, interest, fees and other amounts that accrue after the commencement of any Proceeding, regardless of whether such interest, fees and other amounts are allowed claims in such Proceeding.

"OFAC" is defined in Section 10.3.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Participant" is defined in Section 15.6.2.

"Partner" means either of Howard Wu, an individual with identification number 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 and Taylor Woods, an individual with identification number 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, and "Partners" means both of them, as the context may require.

"Patriot Act" is defined in Section 15.16.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA or the minimum funding standards of ERISA (other than a Multiemployer Pension Plan), and as to which any Loan Party or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Permitted Lien" means a Lien expressly permitted hereunder pursuant to Section 11.2.

"Person" means any natural person, corporation, partnership, trust, limited liability company, association, Governmental Authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

"Prepaid Interest Amount" is defined in Section 4.2.1.

"Pre-positioned Interest Account" means the interest-bearing account in Borrower's name in relation to the Pre-positioned Interest Amount and controlled by Administrative Agent with Wells Fargo as notified by the Borrower to the Administrative Agent on or prior to the execution of the Account Pledge Agreement.

"Pre-positioned Interest Amount" means an amount equal to 9-months of interest calculated at the Interest Rate.

SINGAPORE/#5424.7

"Proceeding" means any voluntary or involuntary proceeding commenced by or against any Loan Party under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking dissolution, receivership, reorganization, arrangement, or other similar relief.

"Pro Rata Share" means with respect to a Lender's obligation to make a Loan and receive payments of interest, fees, and principal with respect thereto, (x) prior to the making of the Loans, the percentage obtained by dividing (i) such Lender's Loan Commitment, by (ii) the aggregate amount of all Lenders' Loan Commitments, and (y) from and after the making of the Loans, the percentage obtained by dividing (i) the principal amount of such Lender's Loan by (ii) the principal amount of all Loans of all Lenders.

"Regulation D" means Regulation D of the FRB.

"Regulation U" means Regulation U of the FRB.

"REIT Chargor" means each of Fortress Empire Group Ltd, Vertical Gain Investments Inc, Dragonbay Fortune Inc and Regal Empire Ventures Ltd, and "REIT Chargors" means all of them, as the context may require.

"REIT Share Charge" means, in respect of a REIT Chargor, the Singapore law governed share charge dated the Closing Date by such REIT Chargor, as chargor, in favor of Administrative Agent, and "REIT Share Charges" means all of them, as the context may require.

"REIT Charged Shares" means, collectively, each REIT Chargor's interest in the Eagle Hospitality Trust REIT as further described in the REIT Share Charges.

"Related Agreements" means all agreements, instruments and documents executed or delivered in connection with the Intercompany Funding.

"Related Transaction" means the transactions contemplated by the Related Agreements.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the PBGC has not waived the notification requirement of Section 4043(a), or the failure of a Pension Plan to meet the minimum funding standards of Section 412 of the Code (without regard to whether the Pension Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"Required Lenders" means, at any time, the Lenders whose Pro Rata Shares exceed 66 2/3% of the Loans.

"SEC" means the Securities and Exchange Commission or any other Governmental Authority succeeding to any of the principal functions thereof.

"Second Lock-up Period" has the meaning given to the same term set forth in the Prospectus dated 16 May 2019 (Registered with the Monetary Authority of Singapore on 16 May 2019) in connection with the initial public offering of Eagle Hospitality REIT Trust.

SINGAPORE/#5424.7

"Senior Officer" means, with respect to any Loan Party, any of the president, the chief executive officer, the chief financial officer or the treasurer of such Loan Party or any other officer of such Loan Party acceptable to Administrative Agent in its sole and absolute discretion.

"Sponsor" means Urban Commons, LLC, a Delaware limited liability company.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding Capital Securities as have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

"Taxes" means any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing, but excluding Excluded Taxes.

"Termination Event" means, with respect to a Pension Plan that is subject to Title IV of ERISA, (a) a Reportable Event, (b) the withdrawal of a Loan Party or any other member of the Controlled Group from such Pension Plan during a plan year in which a Loan Party or any other member of the Controlled Group was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or was deemed such under Section 4068(f) of ERISA, (c) the termination of such Pension Plan, the filing of a notice of intent to terminate the Pension Plan or the treatment of an amendment of such Pension Plan as a termination under Section 4041 of ERISA, (d) the institution by the PBGC of proceedings to terminate such Pension Plan or (e) any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or appointment of a trustee to administer, such Pension Plan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Administrative Agent's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection of priority and for purposes of definitions related to such provisions.

"Unfunded Liability" means the amount (if any) by which the present value of all vested and unvested accrued benefits under all Pension Plans exceeds the fair market value of all assets allocable to those benefits, all determined as of the then most recent valuation date for each Pension Plan, using PBGC actuarial assumptions for single employer plan terminations.

"U.S." or "United States" means the United States of America.

"Withheld Amount" means an amount equal to the aggregate of the Pre-positioned Interest Amount and the Deposit Amount.

"Withholding Certificate" is defined in Section 7.6(d).

SINGAPORE/#5424.7

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

## ANNEX B

### ADDRESSES FOR NOTICES

**BORROWER:** USA LENDCO HOLDINGS, LLC

c/o Urban Commons, LLC
10250 Constellation Blvd., Suite 1750
Los Angeles, CA 90067

Attention: Taylor Woods
Telephone: 213-260-9111
Electronic Mail: taylor@urban-commons.com

**ADMINISTRATIVE AGENT:** MIRAE ASSET SECURITIES & INVESTMENTS (USA), LLC

3701 Wilshire Boulevard
Suite 880
Los Angeles, CA 90010

Attention: Sam Hong
Telephone: +1 323 986 6901
Facsimile: +1 213 262 3810


**LENDER:** MIRAE ASSET SECURITIES & INVESTMENTS (USA), LLC

3701 Wilshire Boulevard
Suite 880
Los Angeles, CA 90010

Attention: Sam Hong
Telephone: +1 323 986 6901
Facsimile: +1 213 262 3810

SINGAPORE/#5424.7

**ANNEX C**

**LENDERS AND PRO RATA SHARES**

| Lender | Loan Commitment | Pro Rata Share |
|---|---|---|
| Mirae Asset Securities & Investments (USA), LLC | **$25,000,000** | 100% |
| TOTALS | $25,000,000 | 100% |

EXHIBIT A

**FORM OF NOTE**

[_____ __20__]

[$_____]                                                        New York, New York

The undersigned (the "<u>Borrower</u>"), for value received, promise to pay to the order of [_____] (the "<u>Lender</u>") at the principal office of Mirae Asset Securities & Investment (USA), LLC (the "<u>Administrative Agent</u>") in Los Angeles, California the aggregate unpaid amount of all Loans made to the Borrower by the Lender pursuant to the Credit Agreement referred to below (as shown on the schedule attached hereto (and any continuation thereof) or in the records of the Lender), such principal amount to be payable on the dates set forth in the Credit Agreement.

The Borrower further promise to pay interest on the unpaid principal amount of each Loan from the date of such Loan until such Loan is paid in full, payable at the rate(s) and at the time(s) set forth in the Credit Agreement.  Payments of both principal and interest are to be made in lawful money of the United States of America.

This Note (this "<u>Note</u>") evidences indebtedness incurred under, and is subject to the terms and provisions of, the Credit Agreement, June [28], 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"; terms not otherwise defined herein are used herein as defined in the Credit Agreement), among the Borrower, certain financial institutions (including the Lender) and Administrative Agent, to which Credit Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

This Note is made under and governed by the internal laws of the state of New York without reference to principles of conflicts of law other than section 5-1401 and section 5-1402 of the New York general obligations law, including all matters of construction, validity and performance.

***(Signature Pages Follow)***

**BORROWER:**                    **USA LENDCO HOLDINGS, LLC**


By:_____
Name:_____
Title:_____

EXHIBIT B

## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.    Assignor[s]:    _____

      _____

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.      Assignee[s]:                    _____

                                        _____

        [for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.      Borrower:       [_____]

4.      Administrative Agent: Mirae Asset Securities & Investments (USA), LLC, as the administrative agent under the Credit Agreement

5.      Credit Agreement:    Credit Agreement, dated as of [_____ __, 20__], among Borrower, the Lenders from time to time party thereto, and Administrative Agent

6.      Assigned Interest:

| Assignor[s][5] | Assignee[s][6] | Facility Assigned[7] | Aggregate Amount of Commitment/ Loans for all Lenders[8] | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment Loans |
|---|---|---|---|---|---|
|  |  | _____ | $_____ | $_____ | _____% |
|  |  | _____ | $_____ | $_____ | _____% |
|  |  | _____ | $_____ | $_____ | _____% |

7.      [Trade Date:  _____][9]

        Effective Date:  _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Revolving Commitment", "Term Loan Commitment", etc.).

[8] Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[9] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNOR</u>

[NAME OF ASSIGNOR]

By: _____
        Name:
        Title:

<u>ASSIGNEE</u>

[NAME OF ASSIGNEE]

By: _____
        Name:
        Title:

[Consented to and][10] Accepted:

MIRAE ASSET SECURITIES &
INVESTMENTS (USA), LLC, as
Administrative Agent

By: _____
        Name:
        Title:

---

[10] To be added only if the consent of Administrative Agent is required by the terms of the Credit Agreement.

ANNEX 1 TO ASSIGNMENT AND ASSUMPTION

[_____]¹¹

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

1.1.    Assignor.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][[the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under the Credit Agreement (subject to such consents, if any, as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section __ thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest; and (b) agrees that (i) it will, independently and without reliance upon Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all

---

¹¹ Describe Credit Agreement at option of Administrative Agent.

of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. **THIS ASSIGNMENT AND ASSUMPTION SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAW OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.**

EXHIBIT C

## FORM OF NOTICE OF BORROWING

To:    Mirae Asset Securities & Investments (USA), LLC, as Administrative Agent

Please refer to the Credit Agreement, June [28], 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among USA LendCo Holdings, LLC, as borrower (the "Borrower"), various financial institutions and Mirae Asset Securities & Investments (USA), LLC, as Administrative Agent.  Terms used but not otherwise defined herein are used herein as defined in the Credit Agreement.

The undersigned hereby gives irrevocable notice, pursuant to Section 2.2 of the Credit Agreement, of a request hereby for a borrowing as follows:

(i)    The requested borrowing date for the proposed borrowing (which is a Business Day) is _____, 20__.

(ii)    The aggregate amount of the proposed borrowing is $_____.

The proceeds of the borrowing shall be disbursed in accordance with the letter of direction to be delivered as a condition to funding pursuant to Section 12.1.4 of the Credit Agreement.  Any disbursements made to the Borrower shall be paid into the following account:

[BORROWER ACCOUNT DETAILS]

The undersigned hereby certifies that on the date hereof and on the date of borrowing set forth above, and immediately after giving effect to the borrowing requested hereby:  (i) no Default or Event of Default exists; and (ii) all of the representations and warranties of each Loan Party set forth in the Credit Agreement and the other Loan Documents are true and correct in all material respects with the same effect as if made on each such date (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties are true and correct in all material respects as of such earlier date.

The Borrower has caused this Notice of Borrowing to be executed and delivered by its officer thereunto duly authorized on _____, 20__.

**BORROWER:**                               **USA LENDCO HOLDINGS, LLC**


By:_____
Name:_____
Title:_____

**ANNEX D**

**Mirae Asset Loan - Funds Flow and Interest Payment Schedule**

| Funds Flow At Closing | Amount | Recipient |
|---|---|---|
| Commitment | $25,000,000 | N/A |
| Less: Arrange Fee | (600,000) | Mirae Asset |
| Less: Prepaid Interest Amount | (511,111) | Mirae Asset |
| Less: Pre-positioned Interest Amount* | (1,527,778) | Mirae Asset* |
| Less: Deposit Amount* | (1,250,000) | Mirae Asset* |
| Proceeds to Borrower at Closing | $21,111,111 | Borrower |

| Interest Period | Beg (inclusive) | End (inclusive) | Interest (USD) | Payment Date |
|---|---|---|---|---|
| 3-Month Up Front | 6/28/2019 | 9/27/2019 | $511,111 | At Closing |
| Period 1 | 9/28/2019 | 10/27/2019 | 166,667 | 10/28/2019 |
| Period 2 | 10/28/2019 | 11/27/2019 | 172,222 | 11/27/2019 |
| Period 3 | 11/28/2019 | 12/27/2019 | 166,667 | 12/27/2019 |
| Period 4 | 12/28/2019 | 1/27/2020 | 172,222 | 1/27/2020 |
| Period 5 | 1/28/2020 | 2/27/2020 | 172,222 | 2/27/2020 |
| Period 6 | 2/28/2020 | 3/27/2020 | 161,111 | 3/27/2020 |
| Period 7 | 3/28/2020 | 4/27/2020 | 172,222 | 4/27/2020 |
| Period 8 | 4/28/2020 | 5/27/2020 | 166,667 | 5/27/2020 |
| Period 9 | 5/28/2020 | 6/28/2020 | 177,778 | 6/29/2020 |

*Pre-positioned Interest Amount and the Deposit Amount will be held by Mirae Asset at time of closing. It will then be applied in accordance with section 2.2.2 of the Credit Agreement (i.e. deposited into the respective accounts) once the Account Pledge Agreement has been executed.*